(Slip Opinion) OCTOBER TERM, 2005 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RANDALL ET AL. *v.* SORRELL ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 04–1528.   Argued February 28, 2006—Decided June 26, 2006*

Vermont's Act 64 stringently limits both the amounts that candidates for state office may spend on their campaigns and the amounts that individuals, organizations, and political parties may contribute to those campaigns.  Soon after Act 64 became law, the petitioners— individuals who have run for state office, citizens who vote in state elections and contribute to campaigns, and political parties and committees participating in state politics—brought this suit against the respondents, state officials charged with enforcing the Act.  The District Court held that Act 64's expenditure limits violate the First Amendment, see *Buckley* v. *Valeo,* 424 U. S. 1, and that the Act's limits on political parties' contributions to candidates were unconstitutional, but found the other contribution limits constitutional.  The Second Circuit held that *all* of the Act's contribution limits are constitutional, ruled that the expenditure limits may be constitutional because they are supported by compelling interests in preventing corruption or its appearance and in limiting the time state officials must spend raising campaign funds, and remanded for the District Court to determine whether the expenditure limits were narrowly tailored to those interests.

*Held:* The judgment is reversed, and the cases are remanded.

382 F. 3d 91, reversed and remanded.

   JUSTICE BREYER, joined by THE CHIEF JUSTICE and JUSTICE ALITO, concluded in Parts I, II–B–3, III, and IV that both of Act 64's sets of

——————

   *Together with No. 04–1530, *Vermont Republican State Committee et al.* v. *Sorrell et al.,* and No. 04–1697, *Sorrell et al.* v. *Randall et al.,* also on certiorari to the same court.

limitations are inconsistent with the First Amendment.  Pp. 6–8, 10–
29.

  1. The expenditure limits violate the First Amendment's free
speech guarantees under *Buckley.*  Pp. 6–8, 10–11.

    (a) In *Buckley,* the Court held, *inter alia*, that the Government's
asserted interest in preventing "corruption and the appearance of
corruption," 424 U. S., at 25, provided sufficient justification for the
contribution limitations imposed on campaigns for federal office by
the Federal Election Campaign Act of 1971, *id.,* at 23–38, but that
FECA's expenditure limitations violated the First Amendment, *id.,* at
39–59.  The Court explained that the difference between the two
kinds of limitations is that expenditure limits "impose significantly
more severe restrictions on protected freedoms of political expression
and association than" do contribution limits.  *Id.*, at 23.  Contribution
limits, though a "marginal restriction," nevertheless leave the con-
tributor "fre[e] to discuss candidates and issues."  *Id.*, at 20–21.  Ex-
penditure limits, by contrast, impose "[a] restriction on the amount of
money a person or group can spend on political communication," *id.*,
at 19, and thereby necessarily "reduc[e] the quantity of expression by
restricting the number of issues discussed, the depth of their explora-
tion, and the size of the audience reached," *ibid.*  For over 30 years, in
considering the constitutionality of a host of campaign finance stat-
utes, this Court has adhered to *Buckley*'s constraints, including those
on expenditure limits.  See, *e.g., McConnell* v. *Federal Election
Comm'n,* 540 U. S. 93, 134.  Pp. 6–8.

    (b) The respondents argue unpersuasively that *Buckley* should be
distinguished from the present cases on a ground they say *Buckley*
did not consider: that expenditure limits help to protect candidates
from spending too much time raising money rather than devoting
that time to campaigning among ordinary voters.  There is no signifi-
cant basis for that distinction.  Act 64's expenditure limits are not
substantially different from those at issue in *Buckley.*  Nor is Ver-
mont's primary justification for imposing its expenditure limits sig-
nificantly different from Congress' rationale for the *Buckley* limits:
preventing corruption and its appearance.  The respondents say un-
persuasively that, had the *Buckley* Court considered the time protec-
tion rationale for expenditure limits, the Court would have upheld
those limits in the FECA.  The *Buckley* Court, however, was aware of
the connection between expenditure limits and a reduction in fund-
raising time.  And, in any event, the connection seems perfectly obvi-
ous.  Under these circumstances, the respondents' argument amounts
to no more than an invitation so to limit *Buckley's* holding as effec-
tively to overrule it.  That invitation is declined.  Pp. 10–11.

  2. Act 64's contribution limits violate the First Amendment because

those limits, in their specific details, burden protected interests in a manner disproportionate to the public purposes they were enacted to advance. Pp. 11–29.

   (a) In upholding the $1,000 contribution limit before it, the *Buckley* Court recognized, *inter alia,* that such limits, unlike expenditure limits, "involv[e] little direct restraint on" the contributor's speech, 424 U. S., at 21, and are permissible as long as the government demonstrates that they are "closely drawn" to match a "sufficiently important interest," *id.*, at 25. It found that the interest there advanced, "prevent[ing] corruption" and its "appearance," was "sufficiently important" to justify the contribution limits, *id.*, at 25–26, and that those limits were "closely drawn." Although recognizing that, in determining whether a particular contribution limit was "closely drawn," the amount, or level, of that limit could make a difference, see *id.*, at 21, the Court added that such "distinctions in degree become significant only when they . . . amount to differences in kind," *id.*, at 30. Pointing out that it had "no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000," *ibid.,* the Court found "no indication" that FECA's contribution limitations would have "any dramatic adverse effect on the funding of campaigns," *id.*, at 21. Since *Buckley*, the Court has consistently upheld contribution limits in other statutes, but has recognized that such limits might *sometimes* work more harm to protected First Amendment interests than their anticorruption objectives could justify, see, *e.g., Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 395–397. Pp. 12–13.

   (b) Although the Court has "no scalpel to probe," 424 U. S., at 30, with exactitude whether particular contribution limits are too low and normally defers to the legislature in that regard, it must nevertheless recognize the existence of some lower bound, as *Buckley* acknowledges. While the interests served by contribution limits, preventing corruption and its appearance, "directly implicate the integrity of our electoral process," *McConnell, supra,* at 136, that does not simply mean the lower the limit, the better. Contribution limits that are too low also can harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability. Where there is strong indication in a particular case, *i.e.*, danger signs, that such risks exist (both present in kind and likely serious in degree), courts, including appellate courts, must review the record independently and carefully with an eye toward assessing the statute's "tailoring," *i.e.,* toward assessing the restrictions' proportionality. See *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485, 499. Danger signs that Act 64's contribution limits may fall outside tolerable First

Amendment limits are present here. They are substantially lower than both the limits the Court has previously upheld and the comparable limits in force in other States. Consequently, the record must be examined to determine whether Act 64's contribution limits are "closely drawn" to match the State's interests. Pp. 13–19.

(c) The record demonstrates that, from a constitutional perspective, Act 64's contribution limits are too restrictive. Five sets of factors, taken together, lead to the conclusion that those limits are not narrowly tailored. *First,* the record suggests, though it does not conclusively prove, that Act 64's contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns. *Second,* Act 64's insistence that a political party and all of its affiliates together abide by *exactly* the same low $200 to $400 contribution limits that apply to individual contributors threatens harm to a particularly important political right, the right to associate in a political party. See, *e.g.*, *California Democratic Party* v. *Jones*, 530 U. S. 567, 574. Although the Court upheld federal limits on political parties' contributions to candidates in *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.,* 533 U. S. 431, the limits there at issue were far less problematic, for they were significantly higher than Act 64's limits, see, *e.g., id.*, at 438–439, and n. 3, and they were much higher than the federal limits on contributions from individuals to candidates, see *id.*, at 453. *Third,* Act 64's treatment of volunteer services aggravates the problem. Although the Act excludes uncompensated volunteer services from its "contribution" definition, it does not exclude the expenses volunteers incur, *e.g.,* travel expenses, in the course of campaign activities. The combination of very low contribution limits and the absence of an exception excluding volunteer expenses may well impede a campaign's ability effectively to use volunteers, thereby making it more difficult for individuals to associate in this way. Cf. *Buckley, supra,* at 22. *Fourth,* unlike the contribution limits upheld in *Shrink,* Act 64's limits are not adjusted for inflation, but decline in real value each year. A failure to index limits means that limits already suspiciously low will almost inevitably become too low over time. *Fifth,* nowhere in the record is there any special justification for Act 64's low and restrictive contribution limits. Rather, the basic justifications the State has advanced in support of such limits are those present in *Buckley.* Indeed, other things being equal, one might reasonably believe that a contribution of, say, $250 (or $450) to a candidate's campaign was less likely to prove a corruptive force than the far larger contributions at issue in the other campaign finance cases the Court has considered. Pp. 19–28.

(d) It is not possible to sever some of the Act's contribution limit

provisions from others that might remain fully operative. Doing so would require the Court to write words into the statute (inflation indexing), to leave gaping loopholes (no limits on party contributions), or to foresee which of many different possible ways the Vermont Legislature might respond to the constitutional objections to Act 64. In these circumstances, the legislature likely would not have intended the Court to set aside the statute's contribution limits. The legislature is free to rewrite those provisions to address the constitutional difficulties here identified. Pp. 28–29.

JUSTICE BREYER, joined by THE CHIEF JUSTICE in Parts II–B–1 and II–B–2, rejected the respondents' argument that *Buckley* should, in effect, be overruled because subsequent experience has shown that contribution limits alone cannot effectively deter corruption or its appearance. *Stare decisis,* the basic legal principle commanding judicial respect for a court's earlier decisions and their rules of law, prevents the overruling of *Buckley.* Adherence to precedent is the norm; departure from it is exceptional, requiring "special justification," *Arizona* v. *Rumsey,* 467 U. S. 203, 212, especially where, as here, the principle at issue has become settled through iteration and reiteration over a long period. There is no special justification here. Subsequent case law has not made *Buckley* a legal anomaly or otherwise undermined its basic legal principles. Cf. *Dickerson* v. *United States,* 530 U. S. 428, 443. Nor is there any demonstration that circumstances have changed so radically as to undermine *Buckley*'s critical factual assumptions. The respondents have not shown, for example, any dramatic increase in corruption or its appearance in Vermont; nor have they shown that expenditure limits are the only way to attack that problem. Cf. *McConnell, supra.* Finally, overruling *Buckley* now would dramatically undermine the considerable reliance that Congress and state legislatures have placed upon it in drafting campaign finance laws. And this Court has followed *Buckley,* upholding and applying its reasoning in later cases. Pp. 8–10.

JUSTICE ALITO agreed that Act 64's expenditure and contribution limits violate the First Amendment, but concluded that respondents' backup argument asking this Court to revisit *Buckley* v. *Valeo,* 424 U. S. 1, need not be reached because they have failed to address considerations of *stare decisis.* Pp. 1–2.

JUSTICE KENNEDY agreed that Vermont's limitations on campaign expenditures and contributions violate the First Amendment, but concluded that, given his skepticism regarding this Court's campaign finance jurisprudence, see, *e.g., McConnell* v. *Federal Election Comm'n,* 540 U. S. 93, 286–287, 313, it is appropriate for him to concur only in the judgment. Pp. 1–3.

JUSTICE THOMAS, joined by JUSTICE SCALIA, agreed that Vermont's

Syllabus

Act 64 is unconstitutional, but disagreed with the plurality's rationale for striking down that statute. *Buckley* v. *Valeo*, 424 U. S. 1, provides insufficient protection to political speech, the core of the First Amendment, is therefore illegitimate and not protected by *stare decisis*, and should be overruled and replaced with a standard faithful to the Amendment. This Court erred in *Buckley* when it distinguished between contribution and expenditure limits, finding the former to be a less severe infringement on First Amendment rights. See, *e.g., Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 410–418. Both the contribution and expenditure restrictions of Act 64 should be subjected to strict scrutiny, which they would fail. See, *e.g., Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 640–641. Pp. 1–10.

BREYER, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., joined, and in which ALITO, J., joined as to all but Parts II–B–1 and II–B–2. ALITO, J., filed an opinion concurring in part and concurring in the judgment. KENNEDY, J., filed an opinion concurring in the judgment. THOMAS, J., filed an opinion concurring in the judgment, in which SCALIA, J., joined. STEVENS, J., filed a dissenting opinion. SOUTER, J., filed a dissenting opinion, in which GINSBURG, J., joined, and in which STEVENS, J., joined as to Parts II and III.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 04–1528, 04–1530 and 04–1697

———————

NEIL RANDALL, ET AL., PETITIONERS
04–1528                            *v.*
WILLIAM H. SORRELL ET AL.


VERMONT REPUBLICAN STATE COMMITTEE, ET AL.,
PETITIONERS
04–1530                            *v.*
WILLIAM H. SORRELL ET AL.


WILLIAM H. SORRELL, ET AL., PETITIONERS
04–1697                            *v.*
NEIL RANDALL ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE BREYER announced the judgment of the Court, and delivered an opinion in which THE CHIEF JUSTICE joins, and in which JUSTICE ALITO joins except as to Parts II–B–1 and II–B–2.

We here consider the constitutionality of a Vermont campaign finance statute that limits both (1) the amounts that candidates for state office may spend on their campaigns (expenditure limitations) and (2) the amounts that individuals, organizations, and political parties may contribute to those campaigns (contribution limitations). Vt. Stat. Ann., Tit. 17, §2801 *et seq.* (2002). We hold that both

sets of limitations are inconsistent with the First Amendment. Well-established precedent makes clear that the expenditure limits violate the First Amendment. *Buckley* v. *Valeo,* 424 U. S. 1, 54–58 (1976) *(per curiam).* The contribution limits are unconstitutional because in their specific details (involving low maximum levels and other restrictions) they fail to satisfy the First Amendment's requirement of careful tailoring. *Id.*, at 25–30. That is to say, they impose burdens upon First Amendment interests that (when viewed in light of the statute's legitimate objectives) are disproportionately severe.

## I

### A

Prior to 1997, Vermont's campaign finance law imposed no limit upon the amount a candidate for state office could spend. It did, however, impose limits upon the amounts that individuals, corporations, and political committees could contribute to the campaign of such a candidate. Individuals and corporations could contribute no more than $1,000 to any candidate for state office. §2805(a) (1996). Political committees, excluding political parties, could contribute no more than $3,000. §2805(b). The statute imposed no limit on the amount that political parties could contribute to candidates.

In 1997, Vermont enacted a more stringent campaign finance law, Pub. Act No. 64, codified at Vt. Stat. Ann., Tit. 17, §2801 *et seq.* (2002) (hereinafter Act or Act 64), the statute at issue here. Act 64, which took effect immediately after the 1998 elections, imposes mandatory expenditure limits on the total amount a candidate for state office can spend during a "two-year general election cycle," *i.e.*, the primary plus the general election, in approximately the following amounts: governor, $300,000; lieutenant governor, $100,000; other statewide offices, $45,000; state senator, $4,000 (plus an additional $2,500

for each additional seat in the district); state representative (two-member district), $3,000; and state representative (single member district), $2,000. §2805a(a). These limits are adjusted for inflation in odd-numbered years based on the Consumer Price Index. §2805a(e). Incumbents seeking reelection to statewide office may spend no more than 85% of the above amounts, and incumbents seeking reelection to the State Senate or House may spend no more than 90% of the above amounts. §2805a(c). The Act defines "[e]xpenditure" broadly to mean the

> "payment, disbursement, distribution, advance, deposit, loan or gift of money or anything of value, paid or promised to be paid, for the purpose of influencing an election, advocating a position on a public question, or supporting or opposing one or more candidates." §2801(3).

With certain minor exceptions, expenditures over $50 made on a candidate's behalf by others count against the candidate's expenditure limit if those expenditures are "intentionally facilitated by, solicited by or approved by" the candidate's campaign. §§2809(b), (c). These provisions apply so as to count against a campaign's expenditure limit any spending by political parties or committees that is coordinated with the campaign and benefits the candidate. And any party expenditure that "primarily benefits six or fewer candidates who are associated with the political party" is "presumed" to be coordinated with the campaign and therefore to count against the campaign's expenditure limit. §§2809(b), (d).

Act 64 also imposes strict contribution limits. The amount any single individual can contribute to the campaign of a candidate for state office during a "two-year general election cycle" is limited as follows: governor, lieutenant governor, and other statewide offices, $400; state senator, $300; and state representative, $200.

§2805(a). Unlike its expenditure limits, Act 64's contribu-
tion limits are not indexed for inflation.

A political committee is subject to these same limits.
*Ibid.* So is a political party, *ibid.*, defined broadly to in-
clude "any subsidiary, branch or local unit" of a party, as
well as any "national or regional affiliates" of a party
(taken separately or together). §2801(5). Thus, for exam-
ple, the statute treats the local, state, and national affili-
ates of the Democratic Party as if they were a single entity
and limits their total contribution to a single candidate's
campaign for governor (during the primary and the gen-
eral election together) to $400.

The Act also imposes a limit of $2,000 upon the amount
any individual can give to a political party during a 2-year
general election cycle. §2805(a).

The Act defines "contribution" broadly in approximately
the same way it defines "expenditure." §2801(2). Any
expenditure made on a candidate's behalf counts as a
contribution to the candidate if it is "intentionally facili-
tated by, solicited by or approved by" the candidate.
§§2809(a), (c). And a party expenditure that "primarily
benefits six or fewer candidates who are associated with
the" party is "presumed" to count against the party's
contribution limits. §§2809(a), (d).

There are a few exceptions. A candidate's own contribu-
tions to the campaign and those of the candidate's family
fall outside the contribution limits. §2805(f). Volunteer
services do not count as contributions. §2801(2). Nor does
the cost of a meet-the-candidate function, provided that
the total cost for the function amounts to $100 or less.
§2809(d).

In addition to these expenditure and contribution limits,
the Act sets forth disclosure and reporting requirements
and creates a voluntary public financing system for gu-
bernatorial elections. §§2803, 2811, 2821–2823, 2831,
2832, 2851–2856. None of these is at issue here. The Act

also limits the amount of contributions a candidate, political committee, or political party can receive from out-of-state sources. §2805(c). The lower courts held these out-of-state contribution limits unconstitutional, and the parties do not challenge that holding.

B

The petitioners are individuals who have run for state office in Vermont, citizens who vote in Vermont elections and contribute to Vermont campaigns, and political parties and committees that participate in Vermont politics. Soon after Act 64 became law, they brought this lawsuit in Federal District Court against the respondents, state officials charged with enforcement of the Act. Several other private groups and individual citizens intervened in the District Court proceedings in support of the Act and are joined here as respondents as well.

The District Court agreed with the petitioners that the Act's expenditure limits violate the First Amendment. See *Buckley,* 424 U. S. 1. The court also held unconstitutional the Act's limits on the contributions of political parties to candidates. At the same time, the court found the Act's other contribution limits constitutional. *Landell* v. *Sorrell,* 118 F. Supp. 2d 470 (Vt. 2000).

Both sides appealed. A divided panel of the Court of Appeals for the Second Circuit held that *all* of the Act's contribution limits are constitutional. It also held that the Act's expenditure limits may be constitutional. *Landell* v. *Sorrell,* 382 F. 3d 91 (2004). It found those limits supported by two compelling interests, namely, an interest in preventing corruption or the appearance of corruption and an interest in limiting the amount of time state officials must spend raising campaign funds. The Circuit then remanded the case to the District Court with instructions to determine whether the Act's expenditure limits were narrowly tailored to those interests.

The petitioners and respondents all sought certiorari. They asked us to consider the constitutionality of Act 64's expenditure limits, its contribution limits, and a related definitional provision. We agreed to do so. 545 U. S. ___ (2005).

## II

We turn first to the Act's expenditure limits. Do those limits violate the First Amendment's free speech guarantees?

### A

In *Buckley* v. *Valeo*, *supra*, the Court considered the constitutionality of the Federal Election Campaign Act of 1971 (FECA), 86 Stat. 3, as amended, 2 U. S. C. §431 *et seq.,* a statute that, much like the Act before us, imposed both expenditure and contribution limitations on campaigns for public office. The Court, while upholding FECA's contribution limitations as constitutional, held that the statute's expenditure limitations violated the First Amendment.

*Buckley* stated that both kinds of limitations "implicate fundamental First Amendment interests." 424 U. S., at 23. It noted that the Government had sought to justify the statute's infringement on those interests in terms of the need to prevent "corruption and the appearance of corruption." *Id.*, at 25; see also *id.*, at 55. In the Court's view, this rationale provided sufficient justification for the statute's contribution limitations, but it did not provide sufficient justification for the expenditure limitations.

The Court explained that the basic reason for this difference between the two kinds of limitations is that expenditure limitations "impose significantly more severe restrictions on protected freedoms of political expression and association than" do contribution limitations. *Id.*, at 23. Contribution limitations, though a "marginal restric-

tion upon the contributor's ability to engage in free communication," nevertheless leave the contributor "fre[e] to discuss candidates and issues." *Id.*, at 20–21. Expenditure limitations, by contrast, impose "[a] restriction on the amount of money a person or group can spend on political communication during a campaign." *Id.*, at 19. They thereby necessarily "reduc[e] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Ibid.* Indeed, the freedom "to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline." *Id.*, at 19, n. 18.

The Court concluded that "[n]o governmental interest that has been suggested is sufficient to justify the restriction on the quantity of political expression imposed by" the statute's expenditure limitations. *Id.*, at 55. It decided that the Government's primary justification for expenditure limitations, preventing corruption and its appearance, was adequately addressed by the Act's contribution limitations and disclosure requirements. *Ibid.* The Court also considered other governmental interests advanced in support of expenditure limitations. It rejected each. *Id.*, at 56–57. Consequently, it held that the expenditure limitations were "constitutionally invalid." *Id.*, at 58.

Over the last 30 years, in considering the constitutionality of a host of different campaign finance statutes, this Court has repeatedly adhered to *Buckley*'s constraints, including those on expenditure limits. See *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 134 (2003); *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 441 (2001) *(Colorado II); Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 386 (2000) *(Shrink); Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 610 (1996) *(Colorado I)* (plurality opinion); *Federal Elec-*

*tion Comm'n* v. *Massachusetts Citizens for Life, Inc.,* 479
U. S. 238, 259–260 (1986); *Federal Election Comm'n* v.
*National Conservative Political Action Comm.,* 470 U. S.
480, 491 (1985) *(NCPAC); California Medical Assn.* v.
*Federal Election Comm'n,* 453 U. S. 182, 194–195 (1981)
(plurality opinion).

## B

### 1

The respondents recognize that, in respect to expenditure limits, *Buckley* appears to be a controlling—and unfavorable—precedent. They seek to overcome that precedent in two ways. First, they ask us in effect to overrule *Buckley.* Post-*Buckley* experience, they believe, has shown that contribution limits (and disclosure requirements) alone cannot effectively deter corruption or its appearance; hence experience has undermined an assumption underlying that case. Indeed, the respondents have devoted several pages of their briefs to attacking *Buckley*'s holding on expenditure limits. See Brief for Respondent-Cross-Petitioner Vermont Public Interest Research Group et al. 36–39 (arguing that "sound reasons exist to revisit the applicable standard of review" for expenditure limits); Brief for Respondent-Cross-Petitioner William Sorrell et al. 28–31 (arguing that "the Court should revisit *Buckley* and consider alternative constitutional approaches to spending limits").

Second, in the alternative, they ask us to limit the scope of *Buckley* significantly by distinguishing *Buckley* from the present case. They advance as a ground for distinction a justification for expenditure limitations that, they say, *Buckley* did not consider, namely that such limits help to protect candidates from spending too much time raising money rather than devoting that time to campaigning among ordinary voters. We find neither argument persuasive.

2

The Court has often recognized the "fundamental importance" of *stare decisis,* the basic legal principle that commands judicial respect for a court's earlier decisions and the rules of law they embody. See *Harris* v. *United States,* 536 U. S. 545, 556–557 (2002) (plurality opinion) (citing numerous cases). The Court has pointed out that *stare decisis* "'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *United States* v. *International Business Machines Corp.*, 517 U. S. 843, 856 (1996) (quoting *Payne* v. *Tennessee,* 501 U. S. 808, 827 (1991)). *Stare decisis* thereby avoids the instability and unfairness that accompany disruption of settled legal expectations. For this reason, the rule of law demands that adhering to our prior case law be the norm. Departure from precedent is exceptional, and requires "special justification." *Arizona* v. *Rumsey,* 467 U. S. 203, 212 (1984). This is especially true where, as here, the principle has become settled through iteration and reiteration over a long period of time.

We can find here no such special justification that would require us to overrule *Buckley*. Subsequent case law has not made *Buckley* a legal anomaly or otherwise undermined its basic legal principles. Cf. *Dickerson* v. *United States,* 530 U. S. 428, 443 (2000). We cannot find in the respondents' claims any demonstration that circumstances have changed so radically as to undermine *Buckley*'s critical factual assumptions. The respondents have not shown, for example, any dramatic increase in corruption or its appearance in Vermont; nor have they shown that expenditure limits are the only way to attack that problem. Cf. *McConnell* v. *FEC,* 540 U. S. 93. At the same time, *Buckley* has promoted considerable reliance. Congress and state legislatures have used *Buckley* when

drafting campaign finance laws. And, as we have said, this Court has followed *Buckley,* upholding and applying its reasoning in later cases. Overruling *Buckley* now would dramatically undermine this reliance on our settled precedent.

For all these reasons, we find this a case that fits the *stare decisis* norm. And we do not perceive the strong justification that would be necessary to warrant overruling so well established a precedent. We consequently decline the respondents' invitation to reconsider *Buckley*.

3

The respondents also ask us to distinguish these cases from *Buckley*. But we can find no significant basis for that distinction. Act 64's expenditure limits are not substantially different from those at issue in *Buckley*. In both instances the limits consist of a dollar cap imposed upon a candidate's expenditures. Nor is Vermont's primary justification for imposing its expenditure limits significantly different from Congress' rationale for the *Buckley* limits: preventing corruption and its appearance.

The sole basis on which the respondents seek to distinguish *Buckley* concerns a further supporting justification. They argue that expenditure limits are necessary in order to reduce the amount of time candidates must spend raising money. Brief for Respondent/Cross-Petitioner Vermont Public Interest Research Group et al. 16–20; Brief for Respondent/Cross-Petitioner William H. Sorrell et al. 22–25. Increased campaign costs, together with the fear of a better-funded opponent, mean that, without expenditure limits, a candidate must spend too much time raising money instead of meeting the voters and engaging in public debate. *Buckley,* the respondents add, did not fully consider this justification. Had it done so, they say, the Court would have upheld, not struck down, FECA's expenditure limits.

In our view, it is highly unlikely that fuller consideration of this time protection rationale would have changed *Buckley*'s result. The *Buckley* Court was aware of the connection between expenditure limits and a reduction in fundraising time. In a section of the opinion dealing with FECA's public financing provisions, it wrote that Congress was trying to "free candidates from the rigors of fundraising." 424 U. S., at 91; see also *id.,* at 96 ("[L]imits on contributions necessarily increase the burden of fundraising," and "public financing" was designed in part to relieve Presidential candidates "from the rigors of soliciting private contributions"); *id.,* at 258–259 (White, J., concurring in part and dissenting in part) (same). The Court of Appeals' opinion and the briefs filed in this Court pointed out that a natural consequence of higher campaign expenditures was that "candidates were compelled to allow to fund raising increasing and extreme amounts of money and energy." *Buckley* v. *Valeo*, 519 F. 2d 821, 838 (CADC 1975); see also Brief for United States et al. as *Amici Curiae* in *Buckley* v. *Valeo*, O. T. 1975, Nos. 75–436 and 75–437, p. 36 ("Fund raising consumes candidate time that otherwise would be devoted to campaigning"). And, in any event, the connection between high campaign expenditures and increased fundraising demands seems perfectly obvious.

Under these circumstances, the respondents' argument amounts to no more than an invitation so to limit *Buckley*'s holding as effectively to overrule it. For the reasons set forth above, we decline that invitation as well. And, given *Buckley*'s continued authority, we must conclude that Act 64's expenditure limits violate the First Amendment.

### III

We turn now to a more complex question, namely the constitutionality of Act 64's contribution limits. The par-

ties, while accepting *Buckley*'s approach, dispute whether, despite *Buckley*'s general approval of statutes that limit campaign contributions, Act 64's contribution limits are so severe that in the circumstances its particular limits violate the First Amendment.

A

As with the Act's expenditure limits, we begin with *Buckley.* In that case, the Court upheld the $1,000 contribution limit before it. *Buckley* recognized that contribution limits, like expenditure limits, "implicate fundamental First Amendment interests," namely, the freedoms of "political expression" and "political association." 424 U. S., at 15, 23. But, unlike expenditure limits (which "necessarily reduc[e] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached," *id.*, at 19), contribution limits "involv[e] little direct restraint on" the contributor's speech, *id.*, at 21. They do restrict "one aspect of the contributor's freedom of political association," namely, the contributor's ability to support a favored candidate, but they nonetheless "permi[t] the symbolic expression of support evidenced by a contribution," and they do "not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.*, at 21, 24.

Consequently, the Court wrote, contribution limitations are permissible as long as the Government demonstrates that the limits are "closely drawn" to match a "sufficiently important interest." *Id.*, at 25. It found that the interest advanced in the case, "prevent[ing] corruption" and its "appearance," was "sufficiently important" to justify the statute's contribution limits. *Id.*, at 25–26.

The Court also found that the contribution limits before it were "closely drawn." It recognized that, in determining whether a particular contribution limit was "closely drawn," the amount, or level, of that limit could make a

difference. Indeed, it wrote that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Id.*, at 21. But the Court added that such "distinctions in degree become significant only when they can be said to amount to differences in kind." *Id.*, at 30. Pointing out that it had "no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000," *ibid.,* the Court found "no indication" that the $1,000 contribution limitations imposed by the Act would have "any dramatic adverse effect on the funding of campaigns," *id.*, at 21. It therefore found the limitations constitutional.

Since *Buckley*, the Court has consistently upheld contribution limits in other statutes. *Shrink,* 528 U. S. 377 ($1075 limit on contributions to candidates for Missouri state auditor); *California Medical Assn.,* 453 U. S. 182 ($5,000 limit on contributions to multicandidate political committees). The Court has recognized, however, that contribution limits might *sometimes* work more harm to protected First Amendment interests than their anticorruption objectives could justify. See *Shrink*, *supra*, at 395–397; *Buckley*, *supra,* at 21. And individual Members of the Court have expressed concern lest too low a limit magnify the "reputation-related or media-related advantages of incumbency and thereby insulat[e] legislators from effective electoral challenge." *Shrink*, *supra*, at 403–404 (BREYER, J., joined by GINSBURG, J., concurring). In the cases before us, the petitioners challenge Act 64's contribution limits on that basis.

### B

Following *Buckley*, we must determine whether Act 64's contribution limits prevent candidates from "amassing the resources necessary for effective [campaign] advocacy," 424 U. S., at 21; whether they magnify the advantages of

incumbency to the point where they put challengers to a significant disadvantage; in a word, whether they are too low and too strict to survive First Amendment scrutiny. In answering these questions, we recognize, as *Buckley* stated, that we have "no scalpel to probe" each possible contribution level. *Id.*, at 30. We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives. In practice, the legislature is better equipped to make such empirical judgments, as legislators have "particular expertise" in matters related to the costs and nature of running for office. *McConnell,* 540 U. S., at 137. Thus ordinarily we have deferred to the legislature's determination of such matters.

Nonetheless, as *Buckley* acknowledged, we must recognize the existence of some lower bound. At some point the constitutional risks to the democratic electoral process become too great. After all, the interests underlying contribution limits, preventing corruption and the appearance of corruption, "directly implicate the integrity of our electoral process." *McConnell, supra,* at 136 (internal quotation marks omitted). Yet that rationale does not simply mean "the lower the limit, the better." That is because contribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability. Were we to ignore that fact, a statute that seeks to regulate campaign contributions could itself prove an obstacle to the very electoral fairness it seeks to promote. Thus, we see no alternative to the exercise of independent judicial judgment as a statute reaches those outer limits. And, where there is strong indication in a particular case, *i.e.*, danger signs, that such risks exist (both present in kind and likely serious in degree), courts, including appellate courts, must review the record independently and carefully with an eye

toward assessing the statute's "tailoring," that is, toward assessing the proportionality of the restrictions. See *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485, 499 (1984) ("[A]n appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression'" (quoting *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 284–286 (1964))).

We find those danger signs present here. As compared with the contribution limits upheld by the Court in the past, and with those in force in other States, Act 64's limits are sufficiently low as to generate suspicion that they are not closely drawn. The Act sets its limits per election cycle, which includes both a primary and a general election. Thus, in a gubernatorial race with both primary and final election contests, the Act's contribution limit amounts to $200 per election per candidate (with significantly lower limits for contributions to candidates for State Senate and House of Representatives, see *supra*, at 3). These limits apply both to contributions from individuals and to contributions from political parties, whether made in cash or in expenditures coordinated (or presumed to be coordinated) with the candidate. See *supra*, at 3–4.

These limits are well below the limits this Court upheld in *Buckley.* Indeed, in terms of real dollars *(i.e.*, adjusting for inflation), the Act's $200 per election limit on individual contributions to a campaign for governor is slightly more than one-twentieth of the limit on contributions to campaigns for federal office before the Court in *Buckley*. Adjusted to reflect its value in 1976 (the year *Buckley* was decided), Vermont's contribution limit on campaigns for statewide office (including governor) amounts to $113.91 per 2-year election cycle, or roughly $57 per election, as compared to the $1,000 per election limit on individual

contributions at issue in *Buckley*. (The adjusted value of Act 64's limit on contributions from political parties to candidates for statewide office, again $200 per candidate per election, is just over one one-hundredth of the comparable limit before the Court in *Buckley*, $5,000 per election.) Yet Vermont's gubernatorial district—the entire State—is no smaller than the House districts to which *Buckley*'s limits applied. In 1976, the average congressional district contained a population of about 465,000. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 459 (1976) (Statistical Abstract) (describing results of 1970 census). Indeed, Vermont's population is 621,000—about one-third *larger*. Statistical Abstract 21 (2006) (describing Vermont's population in 2004).

Moreover, considered as a whole, Vermont's contribution limits are the lowest in the Nation. Act 64 limits contributions to candidates for statewide office (including governor) to $200 per candidate per election. We have found no State that imposes a lower per election limit. Indeed, we have found only seven States that impose limits on contributions to candidates for statewide office at or below $500 per election, more than twice Act 64's limit. Cf. Ariz. Rev. Stat. Ann. §16–905 (West Cum. Supp. 2005) ($760 per election cycle, or $380 per election, adjusted for inflation); Colo. Const., Art. XXVIII, §3 ($500 per election, adjusted for inflation); Fla. Stat. §106.08(1)(a) (2003) ($500 per election); Me. Rev. Stat. Ann., Tit. 21A, §1015(1) (1993) ($500 for governor, $250 for other statewide office, per election); Mass. Gen. Laws, ch. 55, §7A (West Supp. 2006) ($500 per year, or $250 per election); Mont. Code Ann. §13–37–216(1)(a) (2005) ($500 for governor, $250 for other statewide office, per election); S. D. Codified Laws §12–25–1.1 (2004) ($1,000 per year, or $500 per election). We are aware of no State that imposes a limit on contributions from political parties to candidates for statewide office

lower than Act 64's $200 per candidate per election limit. Cf. Me. Rev. Stat. Ann., Tit. 21A, §1015(1) (1993) (next lowest: $500 for contribution from party to candidate for governor, $250 for contribution from party to candidate for other statewide office, both per election). Similarly, we have found only three States that have limits on contributions to candidates for state legislature below Act 64's $150 and $100 per election limits. Ariz. Rev. Stat. Ann. §16–905 (West Cum. Supp. 2005) ($296 per election cycle, or $148 per election); Mont. Code Ann. §13–37–216(1)(a) (2005) ($130 per election); S. D. Codified Laws §12–25–1.1 (2004) ($250 per year, or $125 per election). And we are aware of no State that has a lower limit on contributions from political parties to state legislative candidates. Cf. Me. Rev. Stat. Ann., Tit. 21A, §1015(1) (1993) (next lowest: $250 per election).

Finally, Vermont's limit is well below the lowest limit this Court has previously upheld, the limit of $1,075 per election (adjusted for inflation every two years, see Mo. Rev. Stat. §130.032.2 (1998 Cum. Supp.)) for candidates for Missouri state auditor. *Shrink,* 528 U. S. 377. The comparable Vermont limit of roughly $200 per election, not adjusted for inflation, is less than one-sixth of Missouri's current inflation-adjusted limit ($1,275).

We recognize that Vermont's population is much smaller than Missouri's. Indeed, Vermont is about one-ninth of the size of Missouri. Statistical Abstract 21 (2006). Thus, *per citizen*, Vermont's limit is slightly more generous. As of 2006, the ratio of the contribution limit to the size of the constituency in Vermont is .00064, while Missouri's ratio is .00044, 31% lower. Cf. App. 55 (doing same calculation in 2000).

But this does not necessarily mean that Vermont's limits are less objectionable than the limit upheld in *Shrink.* A campaign for state auditor is likely to be less costly than a campaign for governor; campaign costs do

not automatically increase or decrease in precise propor-
tion to the size of an electoral district. See App. 66 (1998
winning candidate for Vermont state auditor spent about
$60,000; winning candidate for governor spent about
$340,000); Opensecrets.org, The Big Picture, 2004 Cycle:
Hot Races, available at http://www.opensecrets.org/
bigpicture/hotraces.asp?cycle=2004 (as visited June 22,
2006, and available in Clerk of Court's case file) (U. S.
Senate campaigns identified as competitive spend less per
voter than U. S. House campaigns identified as competi-
tive). Moreover, Vermont's limits, unlike Missouri's lim-
its, apply in the same amounts to contributions made by
political parties. Mo. Rev. Stat. §130.032.4 (2000) (enact-
ing limits on contributions from political parties to candi-
dates 10 times higher than limits on contributions from
individuals). And, as we have said, Missouri's (current)
$1,275 per election limit, unlike Vermont's $200 per elec-
tion limit, is indexed for inflation. See *supra*, at 17; see
also Mo. Rev. Stat. §130.032.2 (2000).

The factors we have mentioned offset any neutralizing
force of population differences. At the very least, they
make it difficult to treat *Shrink*'s (then) $1,075 limit as
providing affirmative support for the lawfulness of Ver-
mont's far lower levels. Cf. 528 U. S., at 404 (BREYER, J.,
concurring) (The *Shrink* "limit . . . is low enough to raise
. . . a [significant constitutional] question"). And even
were that not so, Vermont's failure to index for inflation
means that Vermont's levels would soon be far lower than
Missouri's regardless of the method of comparison.

In sum, Act 64's contribution limits are substantially
lower than both the limits we have previously upheld and
comparable limits in other States. These are danger signs
that Act 64's contribution limits may fall outside tolerable
First Amendment limits. We consequently must examine
the record independently and carefully to determine
whether Act 64's contribution limits are "closely drawn" to

match the State's interests.

### C

Our examination of the record convinces us that, from a constitutional perspective, Act 64's contribution limits are too restrictive. We reach this conclusion based not merely on the low dollar amounts of the limits themselves, but also on the statute's effect on political parties and on volunteer activity in Vermont elections. *Taken together*, Act 64's substantial restrictions on the ability of candidates to raise the funds necessary to run a competitive election, on the ability of political parties to help their candidates get elected, and on the ability of individual citizens to volunteer their time to campaigns show that the Act is not closely drawn to meet its objectives. In particular, five factors together lead us to this decision.

*First,* the record suggests, though it does not conclusively prove, that Act 64's contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns. For one thing, the petitioners' expert, Clark Bensen, conducted a race-by-race analysis of the 1998 legislative elections (the last to take place before Act 64 took effect) and concluded that Act 64's contribution limits would have reduced the funds available in 1998 to Republican challengers in competitive races in amounts ranging from 18% to 53% of their total campaign income. See 3 Tr. 52–57 (estimating loss of 47% of funds for candidate Tully, 50% for Harvey, 53% for Welch, 19% for Bahre, 29% for Delaney, 36% for LaRocque, 18% for Smith, and 31% for Brown).

For another thing, the petitioners' expert witnesses produced evidence and analysis showing that Vermont political parties (particularly the Republican Party) "target" their contributions to candidates in competitive races, that those contributions represent a significant amount of total candidate funding in such races, and that the contri-

bution limits will cut the parties' contributions to competitive races dramatically. See 1 *id.,* at 189–190; 3 *id.,* at 50–51; 8 *id.,* at 139; 10 *id.,* at 150; see also, *e.g.*, Gierzynski & Breaux, The Role of Parties in Legislative Campaign Financing, 15 Am. Rev. Politics 171 (1994); Thompson, Cassie, & Jewell, A Sacred Cow or Just a Lot of Bull? Party and PAC Money in State Legislative Elections, 47 Pol. Sci. Q. 223 (1994). Their statistics showed that the party contributions accounted for a significant percentage of the total campaign income in those races. And their studies showed that Act 64's contribution limits would cut the party contributions by between 85% (for the legislature on average) and 99% (for governor).

More specifically, Bensen pointed out that in 1998, the Republican Party made contributions to 19 Senate campaigns in amounts that averaged $2,001, which on average represented 16% of the recipient campaign's total income. 3 Tr. 84. Act 64 would reduce these contributions to $300 per campaign, an average reduction of about 85%. *Ibid.* The party contributed to 50 House campaigns in amounts averaging $787, which on average represented 28% of the recipient campaign's total income. *Id.*, at 85. Act 64 would reduce these contributions to $200 per campaign, an average reduction of 74.5%. *Ibid.* And the party contributed $40,600 to its gubernatorial candidate, an amount that accounted for about 16% of the candidate's funding. *Id.*, at 86. The Act would have reduced that contribution by 99%, to $400.

Bensen added that 57% of all 1998 Senate campaigns and 30% of all House campaigns exceeded Act 64's expenditure limits, which were enacted along with the statute's contribution limits. 7 Trial Exhs. in No. 00–9159(L) etc. (CA2), Exh. 8, p. 2351. Moreover, 27% of all Senate campaigns and 10% of all House campaigns spent more than double those limits. *Ibid.*

The respondents did not contest these figures. Rather, they presented evidence that focused, not upon *strongly contested* campaigns, but upon the funding amounts available for the *average* campaign. The respondents' expert, Anthony Gierzynski, concluded, for example, that Act 64 would have a "minimal effect on . . . candidates' ability to raise funds." App. 46. But he rested this conclusion upon his finding that "only a small proportion of" *all* contributions to *all* campaigns for state office "made during the last three elections would have been affected by the new limits." *Id.*, at 47; see also *id.*, at 51 (discussing "*average* amount of revenues lost to the limits" in legislative races (emphasis added)); *id.*, at 52–53 (discussing total number of campaigns receiving contributions over Act 64's limit). The lower courts similarly relied almost exclusively on averages in assessing Act 64's effect. See 118 F. Supp. 2d, at 470 ("Approximately 88% to 96% of the campaign contributions *to recent House races* were under $200" (emphasis added)); *id.*, at 478 ("Expert testimony revealed that over the last three election cycles the percentage *of all candidates' contributions* received over the contribution limits was less than 10%" (emphasis added)).

The respondents' evidence leaves the petitioners' evidence unrebutted in certain key respects. That is because the critical question concerns not simply the *average* effect of contribution limits on fundraising but, more importantly, the ability of a candidate running against an incumbent officeholder to mount an effective *challenge*. And information about *average* races, rather than *competitive* races, is only distantly related to that question, because competitive races are likely to be far more expensive than the average race. See, *e.g.*, N. Ornstein, T. Mann, & M. Malbin, Vital Statistics on Congress 2001–2002, pp. 89–98 (2002) (data showing that spending in competitive elections, *i.e.*, where incumbent wins with less than 60% of vote or where incumbent loses, is far greater than in most

elections, where incumbent wins with more than 60% of the vote).  We concede that the record does contain some anecdotal evidence supporting the respondents' position, namely, testimony about a post-Act-64 competitive mayoral campaign in Burlington, which suggests that a challenger can "amas[s] the resources necessary for effective advocacy," *Buckley*, 424 U. S., at 21.  But the facts of that particular election are not described in sufficient detail to offer a convincing refutation of the implication arising from the petitioners' experts' studies.

Rather, the petitioners' studies, taken together with low *average* Vermont campaign expenditures and the typically higher costs that a challenger must bear to overcome the name-recognition advantage enjoyed by an incumbent, raise a reasonable inference that the contribution limits are so low that they may pose a significant obstacle to candidates in competitive elections.  Cf. Ornstein, *supra*, at 87–96 (In 2000 U. S. House and Senate elections, successful challengers spent far more than the average candidate).  Information about average races does not rebut that inference.  Consequently, the inference amounts to one factor (among others) that here counts against the constitutional validity of the contribution limits.

*Second,* Act 64's insistence that political parties abide by *exactly* the same low contribution limits that apply to other contributors threatens harm to a particularly important political right, the right to associate in a political party.  See, *e.g.*, *California Democratic Party* v. *Jones*, 530 U. S. 567, 574 (2000) (describing  constitutional importance of  associating in political parties to elect candidates); *Timmons* v. *Twin Cities Area New Party*, 520 U. S. 351, 357 (1997) (same); *Colorado I,* 518 U. S., at 616 (same); *Norman* v. *Reed*, 502 U. S. 279, 288 (1992) (same).  Cf. *Buckley*, *supra,* at 20–22 (contribution limits constitute "only a marginal restriction" on First Amendment rights

*because* contributor remains free to associate politically, *e.g.*, in a political party, and "assist personally" in the party's "efforts on behalf of candidates").

The Act applies its $200 to $400 limits—precisely the same limits it applies to an individual—to virtually all affiliates of a political party taken together as if they were a single contributor. Vt. Stat. Ann., Tit. 17, §2805(a) (2002). That means, for example, that the Vermont Democratic Party, taken together with all its local affiliates, can make one contribution of at most $400 to the Democratic gubernatorial candidate, one contribution of at most $300 to a Democratic candidate for State Senate, and one contribution of at most $200 to a Democratic candidate for the State House of Representatives. The Act includes within these limits not only direct monetary contributions but also expenditures in kind: stamps, stationery, coffee, doughnuts, gasoline, campaign buttons, and so forth. See §2801(2). Indeed, it includes all party expenditures "intended to promote the election of a specific candidate or group of candidates" as long as the candidate's campaign "facilitate[s]," "solicit[s]," or "approve[s]" them. §§2809(a), (c). And a party expenditure that "primarily benefits six or fewer candidates who are associated with the" party is "presumed" to count against the party's contribution limits. §2809(d).

In addition to the negative effect on "amassing funds" that we have described, see *supra*, at 18–21, the Act would severely limit the ability of a party to assist its candidates' campaigns by engaging in coordinated spending on advertising, candidate events, voter lists, mass mailings, even yard signs. And, to an unusual degree, it would discourage those who wish to contribute small amounts of money to a party, amounts that easily comply with individual contribution limits. Suppose that many individuals do not know Vermont legislative candidates personally, but wish

to contribute, say, $20 or $40, to the State Republican Party, with the intent that the party use the money to help elect whichever candidates the party believes would best advance its ideals and interests—the basic object of a political party. Or, to take a more extreme example, imagine that 6,000 Vermont citizens each want to give $1 to the State Democratic Party because, though unfamiliar with the details of the individual races, they would like to make a small financial contribution to the goal of electing a Democratic state legislature. And further imagine that the party believes control of the legislature will depend on the outcome of three (and only three) House races. The Act forbids the party from giving $2,000 (of the $6,000) to each of its candidates in those pivotal races. Indeed, it permits the party to give no more than $200 to each candidate, thereby thwarting the aims of the 6,000 donors from making a meaningful contribution to state politics by giving a small amount of money to the party they support. Thus, the Act would severely inhibit collective political activity by preventing a political party from using contributions by small donors to provide meaningful assistance to any individual candidate. See *supra*, at 19.

We recognize that we have previously upheld limits on contributions from political parties to candidates, in particular the federal limits on coordinated party spending. *Colorado II*, 533 U. S. 431. And we also recognize that any such limit will negatively affect *to some extent* the fund-allocating party function just described. But the contribution limits at issue in *Colorado II* were far less problematic, for they were significantly higher than Act 64's limits. See *id.*, at 438–439, and n. 3, 442, n. 7 (at least $67,560 in coordinated spending and $5,000 in direct cash contributions for U. S. Senate candidates, at least $33,780 in coordinated spending and $5,000 in direct cash contributions for U. S. House candidates). And they were much higher than the federal limits on contributions from indi-

viduals to candidates, thereby reflecting an effort by Congress to balance (1) the need to allow individuals to participate in the political process by contributing to political parties that help elect candidates with (2) the need to prevent the use of political parties "to circumvent contribution limits that apply to individuals." *Id.*, at 453. Act 64, by placing identical limits upon contributions to candidates, whether made by an individual or by a political party, gives to the former consideration *no weight at all.*

We consequently agree with the District Court that the Act's contribution limits "would reduce the voice of political parties" in Vermont to a "whisper." 118 F. Supp. 2d, at 487. And we count the special party-related harms that Act 64 threatens as a further factor weighing against the constitutional validity of the contribution limits.

*Third,* the Act's treatment of volunteer services aggravates the problem. Like its federal statutory counterpart, the Act excludes from its definition of "contribution" all "services provided without compensation by individuals volunteering their time on behalf of a candidate." Vt. Stat. Ann., Tit. 17, §2801(2) (2002). Cf. 2 U. S. C. §431(8)(B)(i) (2000 ed. and Supp. III) (similar exemption in federal campaign finance statute). But the Act does not exclude the expenses those volunteers incur, such as travel expenses, in the course of campaign activities. The Act's broad definitions would seem to count those expenses against the volunteer's contribution limit, at least where the spending was facilitated or approved by campaign officials. Vt. Stat. Ann., Tit. 17, §2801(3) (2002) ("[E]xpenditure" includes "anything of value, paid . . . for the purpose of influencing an election"); §§2809(a), (c) (Any "expenditure . . . intentionally facilitated by, solicited by or approved by the candidate" counts as a "contribution"). And, unlike the Federal Government's treatment of comparable requirements, the State has not (insofar as we are

aware) created an exception excluding such expenses. Cf. 2 U. S. C. §§431(8)(B)(iv), (ix) (2000 ed. and Supp. III) (excluding from the definition of "contribution" volunteer travel expenses up to $1,000 and payment by political party for campaign materials used in connection with volunteer activities).

The absence of some such exception may matter in the present context, where contribution limits are very low. That combination, low limits and no exceptions, means that a gubernatorial campaign volunteer who makes four or five round trips driving across the State performing volunteer activities coordinated with the campaign can find that he or she is near, or has surpassed, the contribution limit. So too will a volunteer who offers a campaign the use of her house along with coffee and doughnuts for a few dozen neighbors to meet the candidate, say, two or three times during a campaign. Cf. Vt. Stat. Ann., Tit. 17, §2809(d) (2002) (excluding expenditures for such activities only up to $100). Such supporters will have to keep careful track of all miles driven, postage supplied (500 stamps equals $200), pencils and pads used, and so forth. And any carelessness in this respect can prove costly, perhaps generating a headline, "Campaign laws violated," that works serious harm to the candidate.

These sorts of problems are unlikely to affect the constitutionality of a limit that is reasonably high. Cf. *Buckley*, 424 U. S., at 36–37 (Coordinated expenditure by a volunteer "provides material financial assistance to a candidate," and therefore "may properly be viewed as a contribution"). But Act 64's contribution limits are so low, and its definition of "contribution" so broad, that the Act may well impede a campaign's ability effectively to use volunteers, thereby making it more difficult for individuals to associate in this way. Cf. *id.*, at 22 (Federal contribution limits "leave the contributor free to become a member of

any political association and to assist personally in the association's efforts on behalf of candidates"). Again, the very low limits at issue help to transform differences in degree into difference in kind. And the likelihood of unjustified interference in the present context is sufficiently great that we must consider the lack of tailoring in the Act's definition of "contribution" as an added factor counting against the constitutional validity of the contribution limits before us.

*Fourth,* unlike the contribution limits we upheld in *Shrink,* see *supra,* at 16, Act 64's contribution limits are not adjusted for inflation. Its limits decline in real value each year. Indeed, in real dollars the Act's limits have already declined by about 20% ($200 in 2006 dollars has a real value of $160.66 in 1997 dollars). A failure to index limits means that limits which are already suspiciously low, see *supra,* at 14–17, will almost inevitably become too low over time. It means that future legislation will be necessary to stop that almost inevitable decline, and it thereby imposes the burden of preventing the decline upon incumbent legislators who may not diligently police the need for changes in limit levels to assure the adequate financing of electoral challenges.

*Fifth,* we have found nowhere in the record any special justification that might warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems that we have described. Rather, the basic justifications the State has advanced in support of such limits are those present in *Buckley.* The record contains no indication that, for example, corruption (or its appearance) in Vermont is significantly more serious a matter than elsewhere. Indeed, other things being equal, one might reasonably believe that a contribution of say, $250 (or $450) to a candidate's campaign was less likely to prove a corruptive force than the far larger con-

tributions at issue in the other campaign finance cases we have considered. See *supra*, at 15–17.

These five sets of considerations, taken together, lead us to conclude that Act 64's contribution limits are not narrowly tailored. Rather, the Act burdens First Amendment interests by threatening to inhibit effective advocacy by those who seek election, particularly challengers; its contribution limits mute the voice of political parties; they hamper participation in campaigns through volunteer activities; and they are not indexed for inflation. Vermont does not point to a legitimate statutory objective that might justify these special burdens. We understand that many, though not all, campaign finance regulations impose certain of these burdens to some degree. We also understand the legitimate need for constitutional leeway in respect to legislative line-drawing. But our discussion indicates why we conclude that Act 64 in this respect nonetheless goes too far. It disproportionately burdens numerous First Amendment interests, and consequently, in our view, violates the First Amendment.

We add that we do not believe it possible to sever some of the Act's contribution limit provisions from others that might remain fully operative. See *Champlin Refining Co.* v. *Corporation Comm'n of Okla.*, 286 U. S. 210, 234 (1932) ("invalid part may be dropped if what is left is fully operative as a law"); see also *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172, 191 (1999) (severability "essentially an inquiry into legislative intent"); Vt. Stat. Ann., Tit. 1, §215 (2003) (severability principles apply to Vermont statutes). To sever provisions to avoid constitutional objection here would require us to write words into the statute (inflation indexing), or to leave gaping loopholes (no limits on party contributions), or to foresee which of many different possible ways the legislature might respond to the constitutional objections we have found.

Opinion of BREYER, J.

Given these difficulties, we believe the Vermont Legislature would have intended us to set aside the statute's contribution limits, leaving the legislature free to rewrite those provisions in light of the constitutional difficulties we have identified.

## IV

We conclude that Act 64's expenditure limits violate the First Amendment as interpreted in *Buckley* v. *Valeo*. We also conclude that the specific details of Act 64's contribution limits require us to hold that those limits violate the First Amendment, for they burden First Amendment interests in a manner that is disproportionate to the public purposes they were enacted to advance. Given our holding, we need not, and do not, examine the constitutionality of the statute's presumption that certain party expenditures are coordinated with a candidate. Vt. Stat. Ann., Tit. 17, §2809(d) (2002). Accordingly, the judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 04–1528, 04–1530 and 04–1697

_____

NEIL RANDALL, ET AL., PETITIONERS
04–1528                    *v.*
WILLIAM H. SORRELL ET AL.


VERMONT REPUBLICAN STATE COMMITTEE, ET AL.,
PETITIONERS
04–1530                    *v.*
WILLIAM H. SORRELL ET AL.


WILLIAM H. SORRELL, ET AL., PETITIONERS
04–1697                    *v.*
NEIL RANDALL ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I concur in the judgment and join in JUSTICE BREYER's opinion except for Parts II–B–1 and II–B–2. Contrary to the suggestion of those sections, respondents' primary defense of Vermont's expenditure limits is that those limits are consistent with *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam).* See Brief for William H. Sorrell et al. in Nos. 04–1528 and 04–1530, pp. 15–28 (hereinafter Sorrell Brief); Brief for Vermont Public Interest Research Group et al. in Nos. 04–1528 and 04–1530, pp. 5–36 (hereinafter VPIRG Brief). Only as a backup argument, an afterthought almost, do respondents make a naked plea for us to "revisit *Buckley*." Sorrell Brief 28; VPIRG Brief 36. This is fairly

incongruous, given that respondents' defense of Vermont's contribution limits rests squarely on *Buckley* and later decisions that built on *Buckley*, and yet respondents fail to explain why it would be appropriate to reexamine only one part of the holding in *Buckley*. More to the point, respondents fail to discuss the doctrine of *stare decisis* or the Court's cases elaborating on the circumstances in which it is appropriate to reconsider a prior constitutional decision. Indeed, only once in 99 pages of briefing from respondents do the words "*stare decisis*" appear, and that reference is in connection with *contribution* limits. See Sorrell Brief 31. Such an incomplete presentation is reason enough to refuse respondents' invitation to reexamine *Buckley*. See *United States* v. *International Business Machines Corp.,* 517 U. S. 843, 856 (1996).

Whether or not a case can be made for reexamining *Buckley* in whole or in part, what matters is that respondents do not do so here, and so I think it unnecessary to reach the issue.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 04–1528, 04–1530 and 04–1697

———————

NEIL RANDALL, ET AL., PETITIONERS
04–1528          *v.*
WILLIAM H. SORRELL ET AL.


VERMONT REPUBLICAN STATE COMMITTEE, ET AL.,
PETITIONERS
04–1530          *v.*
WILLIAM H. SORRELL ET AL.


WILLIAM H. SORRELL, ET AL., PETITIONERS
04–1697          *v.*
NEIL RANDALL ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE KENNEDY, concurring in the judgment.

The Court decides the constitutionality of the limitations Vermont places on campaign expenditures and contributions. I agree that both limitations violate the First Amendment.

As the plurality notes, our cases hold that expenditure limitations "place substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate." *Buckley* v. *Valeo,* 424 U. S. 1, 58–59 (1976) *(per curiam);* see also *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 618 (1996) (principal opinion); *Federal Election Comm'n* v. *National Conservative Political*

*Action Comm.,* 470 U. S. 480, 497 (1985).

The parties neither ask the Court to overrule *Buckley* in full nor challenge the level of scrutiny that decision applies to campaign contributions. The exacting scrutiny the plurality applies to expenditure limitations, however, is appropriate. For the reasons explained in the plurality opinion, respondents' attempts to distinguish the present limitations from those we have invalidated are unavailing. The Court has upheld contribution limits that do "not come even close to passing any serious scrutiny." *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 410 (2000) (KENNEDY, J., dissenting). Those concerns aside, Vermont's contributions, as the plurality's detailed analysis indicates, are even more stifling than the ones that survived *Shrink*'s unduly lenient review.

The universe of campaign finance regulation is one this Court has in part created and in part permitted by its course of decisions. That new order may cause more problems than it solves. On a routine, operational level the present system requires us to explain why $200 is too restrictive a limit while $1,500 is not. Our own experience gives us little basis to make these judgments, and certainly no traditional or well-established body of law exists to offer guidance. On a broader, systemic level political parties have been denied basic First Amendment rights. See, *e.g.*, *McConnell* v. *Federal Election Comm'n,* 540 U. S. 93, 286–287, 313 (2003) (KENNEDY, J., concurring in judgment in part and dissenting in part). Entering to fill the void have been new entities such as political action committees, which are as much the creatures of law as of traditional forces of speech and association. Those entities can manipulate the system and attract their own elite power brokers, who operate in ways obscure to the ordinary citizen.

Viewed within the legal universe we have ratified and helped create, the result the plurality reaches is correct;

given my own skepticism regarding that system and its operation, however, it seems to me appropriate to concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 04–1528, 04–1530 and 04–1697

_____

NEIL RANDALL, ET AL., PETITIONERS
04–1528          *v.*
WILLIAM H. SORRELL ET AL.


VERMONT REPUBLICAN STATE COMMITTEE, ET AL.,
PETITIONERS
04–1530          *v.*
WILLIAM H. SORRELL ET AL.


WILLIAM H. SORRELL, ET AL., PETITIONERS
04–1697          *v.*
NEIL RANDALL ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins,
concurring in the judgment.

Although I agree with the plurality that Vt. Stat. Ann.,
Tit. 17, §2801 *et seq.* (2002) (Act 64), is unconstitutional, I
disagree with its rationale for striking down that statute.
Invoking *stare decisis*, the plurality rejects the invitation
to overrule *Buckley* v. *Valeo*, 424 U. S. 1 (1976) (per cu-
riam).[1]  It then applies *Buckley* to invalidate the expendi-

_____

[1] Although the plurality's *stare decisis* analysis is limited to *Buckley*'s
treatment of expenditure limitations, its reasoning cannot be so con-
fined, and would apply equally to *Buckley*'s standard for evaluating
contribution limits.  See *ante*, at 10 (noting, *inter alia*, that *Buckley* has
engendered "considerable reliance" that would be "dramatically under-
mine[d]" by overruling it now).

ture limitations and, less persuasively, the contribution
limitations. I continue to believe that *Buckley* provides
insufficient protection to political speech, the core of the
First Amendment. The illegitimacy of *Buckley* is further
underscored by the continuing inability of the Court (and
the plurality here) to apply *Buckley* in a coherent and
principled fashion. As a result, *stare decisis* should pose
no bar to overruling *Buckley* and replacing it with a stan-
dard faithful to the First Amendment. Accordingly, I
concur only in the judgment.

I

I adhere to my view that this Court erred in *Buckley*
when it distinguished between contribution and expendi-
ture limits, finding the former to be a less severe in-
fringement on First Amendment rights. See *Nixon* v.
*Shrink Missouri Government PAC*, 528 U. S. 377, 410–418
(2000) (dissenting opinion) (*Shrink*); *Federal Election
Comm'n* v. *Colorado Republican Federal Campaign
Comm.,* 533 U. S. 431, 465–466 (2001) (*Colorado II*) (dis-
senting opinion); *Colorado Republican Federal Campaign
Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 635–
644 (1996) (*Colorado I*) (opinion concurring in judgment
and dissenting in part). "[U]nlike the *Buckley* Court, I
believe that contribution limits infringe as directly and as
seriously upon freedom of political expression and associa-
tion as do expenditure limits." *Id.,* at 640. The *Buckley*
Court distinguished contributions from expenditures
based on the presence of an intermediary between a con-
tributor and the speech eventually produced. But that
reliance is misguided, given that "[e]ven in the case of a
direct expenditure, there is usually some go-between that
facilitates the dissemination of the spender's message."
*Colorado I, supra,* at 638–639; *Shrink, supra,* at 413–418
(Thomas, J., dissenting). Likewise, *Buckley*'s suggestion
that contribution caps only marginally restrict speech,

because "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support," 424 U. S., at 21, even if descriptively accurate, does not support restrictions on contributions. After all, statements of general support are as deserving of constitutional protection as those that communicate specific reasons for that support. *Colorado I, supra*, at 639–640 (opinion of Thomas, J.); *Shrink, supra*, at 414–415, and n. 3 (Thomas, J., dissenting). Accordingly, I would overrule *Buckley* and subject both the contribution and expenditure restrictions of Act 64 to strict scrutiny, which they would fail. See *Colorado I, supra*, at 640–641 (opinion of Thomas, J.) ("I am convinced that under traditional strict scrutiny, broad prophylactic caps on both spending and giving in the political process . . . are unconstitutional"). See also *Colorado II, supra*, at 465–466 (Thomas, J., dissenting).

## II

The plurality opinion, far from making the case for *Buckley* as a rule of law, itself demonstrates that *Buckley*'s limited scrutiny of contribution limits is "insusceptible of principled application," and accordingly is not entitled to *stare decisis* effect. See *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559, 599 (1996) (SCALIA, J., dissenting). Indeed, "'when governing decisions are unworkable or are badly reasoned, this Court has never felt constrained to follow precedent.'" *Vieth* v. *Jubelirer*, 541 U. S. 267, 306 (2004) (plurality opinion) (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991); internal quotation marks omitted). Today's newly minted, multifactor test, particularly when read in combination with the Court's decision in *Shrink, supra*, places this Court in the position of addressing the propriety of regulations of political speech based upon little more than its *impression* of the appropriate limits.

The plurality sets forth what appears to be a two-step

process for evaluating the validity of contribution limits: First, determine whether there are "danger signs" in a particular case that the limits are too low; and, second, use "independent judicial judgment" to "review the record independently and carefully with an eye towards assessing the statute's 'tailoring,' that is, towards assessing the proportionality of the restrictions." *Ante*, at 14. Neither step of this test can be reduced to a workable inquiry to be performed by States attempting to comply with this Court's jurisprudence.

As to the first step, it is entirely unclear how to determine whether limits are so low as to constitute "danger signs" that require a court to "examine the record independently and carefully." *Ante*, at 18. The plurality points to several aspects of the Act that support its conclusion that such signs are present here: (1) the limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in the Nation; and (4) the limits are below those we have previously upheld. *Ante*, at 15–19.

The first two elements of the Act are indeed constitutionally problematic, but they have no bearing on whether the contribution limits are too low. The first substantially advantages candidates in a general election who did not face a serious primary challenge. In practice, this restriction will generally suppress more speech by challengers than by incumbents, without serving the interests the Court has recognized as compelling, *i.e.*, the prevention of corruption or the appearance thereof. Cf. B. Smith, Unfree Speech: The Folly of Campaign Finance Reform 50–51 (2001) (hereinafter Smith) (describing the ability of incumbents to amass money early, discouraging serious challengers from entering a race). The second element has no relation to these compelling interests either, given that "'[t]he very aim of a political party is to influence its can-

didate's stance on issues and, if the candidate takes office or is reelected, his votes.'" *Colorado II*, 533 U. S., at 476 (Thomas, J., dissenting) (citing *Colorado I*, 518 U. S., at 646 (Thomas, J., concurring in judgment and dissenting in part)). That these provisions are unconstitutional, however, does not make the contribution limits on individuals unconstitutionally low.

We are left, then, with two reasons to scrutinize Act 64's limitations: They are lower than those of other States, and lower than those we have upheld in previous cases, *i.e.*, *Buckley* and *Shrink*. But the relative limits of other States cannot be the key factor, for such considerations are nothing more than a moving target. After all, if the Vermont Legislature simply persuaded several other States to lower their contribution limits to parallel Act 64, then the Act, which would still "significantly restrict the amount of funding available for challengers to run competitive campaigns," *ante*, at 19, would survive this aspect of the majority's proposed test.

Nor is the relationship of these limits to those in *Buckley* and *Shrink* a critical fact. In *Shrink,* the Court specifically determined that *Buckley* did not "set a minimum constitutional threshold for contribution limits," rejecting such a contention as a "fundamental misunderstanding of what we held." 528 U. S., at 396. The plurality's current treatment of the limits in *Shrink* as a constitutional minimum, or at least as limits below which "danger signs" are present, thus cannot be reconciled with *Shrink* itself.

Having nevertheless concluded that these "danger signs" require us to scrutinize the record, the plurality embarks on an odd review of the contribution limits, combining unrelated factors to determine that, "*taken together*," *ante*, at 19, the restrictions of Act 64 are not closely drawn to meet their objectives. Two of these factors simply cause the already stringent limitations on individual contributions to be more stringent; *i.e.*, volun-

teer services count toward the contribution limit, *ante*, at
25–27, and the limits do not change with inflation, so they
will become even more stringent in time, *ante*, at 27.[2]
While these characteristics confirm the plurality's impres-
sion that these limits are, indeed, quite low, they have
nothing whatsoever to do with whether the restrictions
are closely drawn to meet their objectives.  The plurality
would presumably uphold a limit on contributions of $1
million, even if volunteer services counted toward that
limit and the limit did not change with inflation.  Charac-
terizing these facts as shifting Act 64's limits from "suspi-
ciously low" to "too low," *ibid.,* provides no insight on how
to draw this constitutional line.

The plurality next departs from the general applicability
of the contribution limits entirely, and notes the substan-
tial interference of the contribution limits with the activi-
ties of parties.  Again, I do not dispute that the limitation
on party contributions is unconstitutional; as I have previ-
ously noted, such limitations are unconstitutional even
under *Buckley*.  See *Colorado II*, *supra,* at 476–477.  But it
is entirely unclear why the mere fact that the "suspi-
ciously low" contribution limits *also apply to parties*
should mean that those limits are in fact "too low" when
they are applied to individuals.  If the limits impermissi-
bly intrude upon the associational rights of parties, then
the limits are unconstitutional as applied to parties.  But

--------

[2] Ironically, the plurality is troubled by the fact that the absence of a
provision adjusting the limits for inflation means that the real value of
the limits will decline, and that "the burden of preventing the decline
[lies] upon incumbent legislators who may not diligently police the need
for changes in limit levels to assure the adequate financing of electoral
challenges."  *Ante*, at 27.  It is impossible to square this wariness of
incumbents' disinclination to enact future laws protecting challengers
with the plurality's deference to those same incumbents when they
make empirical judgments regarding "the precise restriction necessary
to carry out the statute's legitimate objectives" in the first place.  *Ante*,
at 14.

limits *on individuals* cannot be transformed from permissible to too low simply because they also apply to political parties.[3]

We are left, then, with two arguably relevant points to transform these contribution limits from the realm of the "suspicious" to the realm of the impermissible. First, the limits affect a substantial portion of the money given to challengers. But contribution limits always disproportionately burden challengers, who often have smaller bases of support than incumbents. See Smith, 66–70. In *Shrink*, the Court expressly rejected the argument that a negative impact on a challenger could render a contribution limit invalid, relying on the same sort of analysis of the "*average* effect of contribution limits on fundraising," *ante*, at 21, that the plurality today rejects. See 528 U. S., at 396 (noting that 97.62% of all contributors for state auditor made contributions of less than $2,000, and that "[e]ven if we were to assume that the contribution limits affected respondent['s] ability to wage a competitive campaign . . . a showing of one affected individual does not point up a system of suppressed political advocacy "that

─────────

[3] The plurality's connection of these two factors implies that it is concerned not with the impact on the speech of contributors, but solely with the speech of candidates, for whom the two facts might be connected. See *ante*, at 19. Indeed, the plurality notably omits interference with participation in campaigns through monetary contributions from the list of reasons the Act is unconstitutional. See *id.*, at 19, 27. But contributors, too, have a right to free speech. See *Colorado I* 518 U. S. 604, 637 (1996) (THOMAS, J., concurring in judgment and dissenting in part) ("If an individual is limited in the amount of resources he can contribute to the pool, he is most certainly limited in his ability to associate for purposes of effective advocacy"). Even *Buckley* v. *Valeo*, 424 U. S. 1 (1976) (per curiam), recognizes that contribution limits restrict the free speech of contributors, even if it understates the significance of this restriction. See *id.*, at 20–21 ("[A] limitation upon the amount that any one person or group may contribute to a candidate . . . entails only a marginal restriction upon the contributor's ability to engage in free communication").

would be unconstitutional under *Buckley*"). Cf. *id.*, at 420 (Thomas, J., dissenting) ("The Court in *Buckley* provided no basis for suppressing the speech of an individual candidate simply because other candidates (or candidates in the aggregate) may succeed in reaching the voting public . . . any such reasoning would fly in the face of the premise of our political system—liberty vested in individual hands safeguards the functioning of our democracy"). An individual's First Amendment right is infringed whether his speech is decreased by 5% or 95%, and whether he suffers alone or shares his violation with his fellow citizens. Certainly, the First Amendment does not authorize us to judge whether a restriction of political speech imposes a sufficiently severe disadvantage on challengers that a candidate should be able to complain. See *Shrink*, *supra*, at 427 (Thomas, J., dissenting) ("[C]ourts have no yardstick by which to judge the proper amount and effectiveness of campaign speech").

The plurality's final justification fares no better. Arguing that Vermont offers no justification for imposing a limit lower than that imposed in any other State is simply another way of saying that the benchmark for whether a contribution limitation is constitutional is what other States have imposed. As I have noted above, *supra*, at 6, tying individuals' First Amendment rights to the presence or absence of similar laws in other States is inconsistent with the First Amendment.

The plurality recognizes that the burdens which lead it to invalidate Act 64's contribution limits are present under "many, though not all, campaign finance regulations." *Ante*, at 28. As a result, the plurality does not purport to offer any single touchstone for evaluating the constitutionality of such laws. Indeed, its discussion offers nothing resembling a rule at all. From all appearances, the plurality simply looked at these limits and said, in its "independent judicial judgment," *ante*, at 14, that they are

too low. The atmospherics—whether they vary with infla-
tion, whether they are as high as those in other States or
those in *Shrink* and *Buckley*, whether they apply to volun-
teer activities and parties—no doubt help contribute to the
plurality's sentiment. But a feeling does not amount to a
workable rule of law.

This is not to say that the plurality errs in concluding
that these limits are too low to satisfy even *Buckley*'s
lenient standard. Indeed, it is almost impossible to imag-
ine that any legislator would ever find his scruples over-
come by a $201 donation. See *Shrink*, *supra*, at 425
(Thomas, J., dissenting) ("I cannot fathom how a $251
contribution could pose a substantial risk of 'secur[ing] a
political *quid pro quo*'" (quoting *Buckley*, 424 U. S., at 26)).
And the statistics relied on by the plurality indeed reveal
that substantial resources will be lost by candidates run-
ning campaigns under these limits. See *ante*, at 19–22.
Given that these contribution limits severely impinge on
the ability of candidates to run campaigns and on the
ability of citizens to contribute to campaigns, and do so
without any demonstrable need to avoid corruption, they
cannot possibly satisfy even *Buckley*'s ambiguous level of
scrutiny.

But the plurality's determination that this statute
clearly lies on the *impermissible* side of the constitutional
line gives no assistance in drawing this line, and it is clear
that no such line can be drawn rationally. There is simply
no way to calculate just how much money a person would
need to receive before he would be corrupt or perceived to
be corrupt (and such a calculation would undoubtedly vary
by person). Likewise, there is no meaningful way of dis-
cerning just how many resources must be lost before
speech is "disproportionately burden[ed]." *Ante*, at 28.
*Buckley*, as the plurality has applied it, gives us license to
simply strike down any limits that just *seem* to be too
stringent, and to uphold the rest. The First Amendment

does not grant us this authority. *Buckley* provides no consistent protection to the core of the First Amendment, and must be overruled.

*    *    *

For these reasons, I concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

Nos. 04–1528, 04–1530 and 04–1697

NEIL RANDALL, ET AL., PETITIONERS
04–1528          *v.*
WILLIAM H. SORRELL ET AL.

VERMONT REPUBLICAN STATE COMMITTEE, ET AL.,
PETITIONERS
04–1530          *v.*
WILLIAM H. SORRELL ET AL.

WILLIAM H. SORRELL, ET AL., PETITIONERS
04–1697          *v.*
NEIL RANDALL ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE STEVENS, dissenting.

JUSTICE BREYER and JUSTICE SOUTER debate whether the *per curiam* decision in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), forecloses any constitutional limitations on candidate expenditures. This is plainly an issue on which reasonable minds can disagree. The *Buckley* Court never explicitly addressed whether the pernicious effects of endless fundraising can serve as a compelling state interest that justifies expenditure limits, *post,* at 2 (SOUTER, J., dissenting), yet its silence, in light of the record before it, suggests that it implicitly treated this proposed interest insufficient, *ante,* at 11 (plurality opinion of BREYER, J.). Assuming this to be true, however, I am convinced that *Buckley*'s holding on expenditure limits is wrong, and that

the time has come to overrule it.

I have not reached this conclusion lightly. As JUSTICE BREYER correctly observes, *stare decisis* is a principle of "'fundamental importance.'" *Ante,* at 9. But it is not an inexorable command, and several factors, taken together, provide special justification for revisiting the constitutionality of statutory limits on candidate expenditures.

To begin with, *Buckley*'s holding on expenditure limits itself upset a long-established practice. For the preceding 65 years, congressional races had been subject to statutory limits on both expenditures and contributions. See 37 Stat. 28; Federal Corrupt Practices Act of 1925, 43 Stat. 1073; Federal Election Campaign Finance Act of 1971, 86 Stat. 5; Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263; *United States* v. *Automobile Workers,* 352 U. S. 567, 575–576 (1957); *McConnell* v. *Federal Election Comm'n,* 540 U. S. 93, 115–117 (2003). As the Court of Appeals had recognized in *Buckley* v. *Valeo,* 519 F. 2d 821, 859 (CADC 1975) (en banc) (*per curiam),* our earlier jurisprudence provided solid support for treating these limits as permissible regulations of conduct rather than speech. *Ibid.* (discussing *Burroughs* v. *United States,* 290 U. S. 534 (1934), and *United States* v. *Harriss,* 347 U. S. 612 (1954)); see also 519 F. 2d, at 841, and n. 41, 851, and n. 68. While *Buckley*'s holding on contribution limits was consistent with this backdrop, its holding on expenditure limits "involve[d] collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience," *Helvering* v. *Hallock,* 309 U. S. 106, 119 (1940).

There are further reasons for reexamining *Buckley*'s holding on candidate expenditure limits that do not apply to its holding on candidate contribution limits. Although we have subsequently reiterated the line *Buckley* drew between these two types of limits, we have done so primarily in cases affirming the validity of contribution limits or their functional equivalents. See *McConnell,* 540 U. S., at

134–138; *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.,* 533 U. S. 431, 440–442 (2001); *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 386–387 (2000); cf. *California Medical Assn.* v. *Federal Election Comm'n,* 453 U. S. 182, 194–195 (1981) (plurality opinion). In contrast, these are our first post-*Buckley* cases that raise the constitutionality of expenditure limits on the amounts that candidates for office may spend on their own campaigns.[1]

Accordingly, while we have explicitly recognized the importance of *stare decisis* in the context of *Buckley*'s holding on contribution limits, *McConnell,* 540 U. S., at 137–138, we have never before done so with regard to its rejection of expenditure limits. And *McConnell*'s recognition rested largely on an interest specific to *Buckley*'s holding on contribution limits. There, we stated that "[c]onsiderations of *stare decisis, buttressed by the respect that the Legislative and Judicial Branches owe to one another,* provide additional powerful reasons for adhering to the analysis of contribution limits that the Court has consistently followed since *Buckley* was decided." 540 U. S., at 137–138 (emphasis added). This powerful buttress is absent from *Buckley*'s refusal to defer to the Legislature's judgment as to the importance of expenditure limits. Relatedly, while Congress and state legislatures have long relied on *Buckley*'s authorization of contribution limits, *Buckley*'s rejection of expenditure limits "has not induced [comparable] detrimental reliance," *Lawrence* v.

---

[1] We have, of course, invalidated limits on independent expenditures by third persons. *Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U. S. 480 (1985); *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604 (1996); cf. *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.,* 479 U. S. 238 (1986). In these cases the principal parties accepted *Buckley*'s holding on candidate expenditure limits and gave us no cause to consider how much weight to give *stare decisis*.

*Texas,* 539 U. S. 558, 577 (2003). See also *Vieth* v. *Jubelirer,* 541 U. S. 267, 306 (2004) (plurality opinion) (noting lessened *stare decisis* concern where "it is hard to imagine how any action taken in reliance upon [the prior case] could conceivably be frustrated").

Perhaps in partial recognition of these points, Justice White refused to abandon his opposition to *Buckley*'s holding on expenditure limits. See *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.,* 479 U. S. 238, 271 (1986); *Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U. S. 480, 507–512 (1985) (dissenting opinion). He believed *Buckley* deeply wrong on this issue because it confused "the identification of speech with its antecedents." *National Conservative Political Action Comm.,* 470 U. S., at 508. Over the course of his steadfast campaign, he converted at least one other *Buckley* participant to this position, see *National Conservative Political Action Comm.,* 470 U. S., at 518–521 (Marshall, J., dissenting), and his reasoning has since persuaded me—the nonparticipating Member of the *Buckley* Court—as well.

As Justice White recognized, it is quite wrong to equate money and speech. *Buckley,* 424 U. S., at 263 (opinion concurring in part and dissenting in part). To the contrary,

> "The burden on actual speech imposed by limitations on the spending of money is minimal and indirect. All rights of direct political expression and advocacy are retained. Even under the campaign laws as originally enacted, everyone was free to spend as much as they chose to amplify their views on general political issues, just not specific candidates. The restrictions, to the extent they do affect speech, are viewpoint-neutral and indicate no hostility to the speech itself or its effects." *National Conservative Po-*

*litical Action Comm.,* 470 U. S., at 508–509 (White, J., dissenting).

Accordingly, these limits on expenditures are far more akin to time, place, and manner restrictions than to restrictions on the content of speech. Like Justice White, I would uphold them "so long as the purposes they serve are legitimate and sufficiently substantial." *Buckley,* 424 U. S., at 264.

*Buckley*'s conclusion to the contrary relied on the following oft-quoted metaphor:

> "Being free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline." *Id.,* at 19, n. 18.

But, of course, while a car cannot run without fuel, a candidate can speak without spending money. And while a car can only travel so many miles per gallon, there is no limit on the number of speeches or interviews a candidate may give on a limited budget. Moreover, provided that this budget is above a certain threshold, a candidate can exercise due care to ensure that her message reaches all voters. Just as a driver need not use a Hummer to reach her destination, so a candidate need not flood the airways with ceaseless sound-bites of trivial information in order to provide voters with reasons to support her.

Indeed, the examples of effective speech in the political arena that did not depend on any significant expenditure by the campaigner are legion. It was the content of William Jennings Bryan's comments on the "Cross of Gold"— and William McKinley's responses delivered from his front porch in Canton, Ohio—rather than any expenditure of money that appealed to their cost-free audiences. Neither Abraham Lincoln nor John F. Kennedy paid for the opportunity to engage in the debates with Stephen Douglas and Richard Nixon that may well have determined the out-

comes of Presidential elections. When the seasoned campaigners who were Members of the Congress that endorsed the expenditure limits in the Federal Election Campaign Act Amendments of 1974 concluded that a modest budget would not preclude them from effectively communicating with the electorate, they necessarily rejected the *Buckley* metaphor.

These campaigners also identified significant government interests favoring the imposition of expenditure limits. Not only do these limits serve as an important complement to corruption-reducing contribution limits, see *id.,* at 264 (opinion of White, J.), but they also "protect equal access to the political arena, [and] free candidates and their staffs from the interminable burden of fundraising." *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 649–650 (1996) (STEVENS, J., dissenting). These last two interests are particularly acute. When campaign costs are so high that only the rich have the reach to throw their hats into the ring, we fail "to protect the political process from undue influence of large aggregations of capital and to promote individual responsibility for democratic government." *Automobile Workers,* 352 U. S., at 590. States have recognized this problem,[2] but *Buckley*'s perceived ban on expenditure limits severely limits their options in dealing with it.

The interest in freeing candidates from the fundraising straitjacket is even more compelling. Without expenditure limits, fundraising devours the time and attention of political leaders, leaving them too busy to handle their public responsibilities effectively. That fact was well recognized by backers of the legislation reviewed in *Buckley,* by the Court of Appeals judges who voted to uphold

―――――――
[2] See Brief for State of Connecticut et al. as *Amici Curiae* 16–17 (citing Ariz. Rev. Stat. §16–940(B)(7); Colo. Rev. Stat. §1–45–102; Neb. Rev. Stat. §32-1602(1); and R. I. Gen. Laws §17–25–18).

the expenditure limitations in that statute, and by Justice White—who not incidentally had personal experience as an active participant in a Presidential campaign. Cf. 519 F. 2d, at 838 (and citations to legislative history contained therein); 424 U. S., at 265 (opinion of White, J.). The validity of their judgment has surely been confirmed by the mountains of evidence that has been accumulated in recent years concerning the time that elected officials spend raising money for future campaigns and the adverse effect of fundraising on the performance of their official duties.[3]

Additionally, there is no convincing evidence that these important interests favoring expenditure limits are fronts for incumbency protection. *Buckley*'s cursory suggestion to the contrary, *id.,* at 56–57, failed to take into account the mixed evidence before it on this issue. See 519 F. 2d, at 861, 862 (detailing how "[t]he material available to the court looks both ways"). And only by "permit[ting] States nationwide to experiment with these critically needed reforms,"—as 18 States urge us to do—will we enable further research on how expenditure limits relate to our incumbent reelection rates. See Brief for State of Connecticut et al. as *Amici Curiae* 3.[4] In the meantime, a

––––––––

[3] See, *e.g.,* Alexander, Let Them Do Their Jobs: The Compelling Government Interest in Protecting the Time of Candidates and Elected Officials, 37 Loyola U. Chi. L. J. 669, 673–683 (2006); see also *post,* at 3 (SOUTER, J., dissenting).

[4] Indeed, the example of the city of Albuquerque suggests that concerns about incumbent entrenchment are unfounded. In 1974, the city set expenditure limits on municipal elections. A 2-year interlude aside, these limits applied until 2001, when they were successfully challenged by municipal candidates. *Homans* v. *Albuquerque,* 217 F. Supp. 2d 1197, 1200 (NM 2002), aff'd, 366 F. 3d 900 (CA10), cert. denied, 543 U. S 1002 (2004). In its findings of fact, the Federal District Court determined that "[n]ationwide, eighty-eight percent (88%) of incumbent Mayors successfully sought reelection in 1999. In contrast, since 1974, the City has had a zero percent (0%) success rate for Mayors seeking

legislative judgment that "enough is enough" should command the greatest possible deference from judges interpreting a constitutional provision that, at best, has an indirect relationship to activity that affects the quantity—rather than the quality or the content—of repetitive speech in the marketplace of ideas.

One final point bears mention. Neither the opinions in *Buckley* nor those that form today's cacophony pay heed to how the Framers would have viewed candidate expenditure limits. This is not an unprincipled approach, as the historical context is "usually relevant but not necessarily dispositive." *Georgia* v. *Randolph,* 547 U. S. ___, ___ (2006) (slip op., at 1) (STEVENS, J., concurring). This is particularly true of contexts that are so different. At the time of the framing the accepted posture of the leading candidates was one of modesty, acknowledging a willingness to serve rather than a desire to compete. Speculation about how the Framers would have legislated if they had foreseen the era of televised sound-bites thus cannot provide us with definitive answers.

Nevertheless, I am firmly persuaded that the Framers would have been appalled by the impact of modern fundraising practices on the ability of elected officials to perform their public responsibilities. I think they would have viewed federal statutes limiting the amount of money that congressional candidates might spend in future elections

—————

reelection." 217 F. Supp. 2d, at 1200 (citation omitted). The court further concluded that the "system of unlimited spending has deleterious effects on the competitiveness of elections because it gives incumbent candidates an electoral advantage." *Ibid.* While far from conclusive, this example cuts against the view that there is a slam-dunk correlation between expenditure limits and incumbent advantage. See also Brief for Center for Democracy and Election Management at American University as *Amicus Curiae* (concluding that Canada, the United Kingdom, New Zealand, and Malta—all of which have campaign expenditure limits—have more electoral competition than the United States, Jamaica, Ireland, and Australia—all of which lack such limits).

as well within Congress' authority.[5]　And they surely would not have expected judges to interfere with the enforcement of expenditure limits that merely require candidates to budget their activities without imposing any restrictions whatsoever on what they may say in their speeches, debates, and interviews.

For the foregoing reasons, I agree with JUSTICE SOUTER that it would be entirely appropriate to allow further proceedings on expenditure limits to go forward in these cases.　For the reasons given in Parts II and III of his dissent, I also agree that Vermont's contribution limits and presumption of coordinated expenditures by political parties are constitutional, and so join those portions of his opinion.

────────────

[5] See Art. I, §4 (providing that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations"); see also §5 (providing that "Each House may determine the Rules of its Proceedings").

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 04–1528, 04–1530 and 04–1697

———————

NEIL RANDALL, ET AL., PETITIONERS
04–1528                *v.*
WILLIAM H. SORRELL ET AL.


VERMONT REPUBLICAN STATE COMMITTEE, ET AL.,
PETITIONERS
04–1530                *v.*
WILLIAM H. SORRELL ET AL.


WILLIAM H. SORRELL, ET AL., PETITIONERS
04–1697                *v.*
NEIL RANDALL ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, and with whom JUSTICE STEVENS joins as to Parts II and III, dissenting.

In 1997, the Legislature of Vermont passed Act 64 after a series of public hearings persuaded legislators that rehabilitating the State's political process required campaign finance reform. A majority of the Court today decides that the expenditure and contribution limits enacted are irreconcilable with the Constitution's guarantee of free speech. I would adhere to the Court of Appeals's decision to remand for further enquiry bearing on the limitations on candidates' expenditures, and I think the contribution limits satisfy controlling precedent. I respectfully dissent.

## I

Rejecting Act 64's expenditure limits as directly contra-
vening *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam)*,
*ante,* at 8–11 (opinion of BREYER, J.), is at least premature.

We said in *Buckley* that "expenditure limitations impose
far greater restraints on the freedom of speech and asso-
ciation than do . . . contribution limitations," 424 U. S., at
44, but the *Buckley* Court did not categorically foreclose
the possibility that some spending limit might comport
with the First Amendment.  Instead, *Buckley* held that the
constitutionality of an expenditure limitation "turns on
whether the governmental interests advanced in its sup-
port satisfy the [applicable] exacting scrutiny." *Ibid.*  In
applying that standard in *Buckley* itself, the Court gave no
indication that it had given serious consideration to an
aim that Vermont's statute now pursues: to alleviate the
drain on candidates' and officials' time caused by the
endless fundraising necessary to aggregate many small
contributions to meet the opportunities for ever more
expensive campaigning.  Instead, we dwelt on rejecting
the sufficiency of interests in reducing corruption, equaliz-
ing the financial resources of candidates, and capping the
overall cost of political campaigns, see *id.,* at 55–57.  Al-
though Justice White went a step further in dissenting
from the Court on expenditures, and made something of
the interest in getting officials off the "treadmill" driven by
the "obsession with fundraising," see *id.,* at 265 (opinion
concurring in part and dissenting in part), this lurking
issue was not treated as significant on the expenditure
question in the *per curiam* opinion.  Whatever the obser-
vations made to the *Buckley* Court about the effect of
fundraising on candidates' time, the Court did not
squarely address a time-protection interest as support for
the expenditure limits, much less one buttressed by as

thorough a record as we have here.*

Vermont's argument therefore does not ask us to over-rule *Buckley;* it asks us to apply *Buckley*'s framework to determine whether its evidence here on a need to slow the fundraising treadmill suffices to support the enacted limitations. Vermont's claim is serious. Three decades of experience since *Buckley* have taught us much, and the findings made by the Vermont Legislature on the perni-cious effect of the nonstop pursuit of money are signifi-cant. See, *e.g.,* Act 64, H. 28, Legislative Findings and Intent, at App. 20 (finding that "candidates for statewide offices are spending inordinate amounts of time raising campaign funds"); *ibid.* (finding that "[r]obust debate of issues, candidate interaction with the electorate, and public involvement and confidence in the electoral process have decreased as campaign expenditures have in-creased"); see also *Landell* v. *Sorrell*, 118 F. Supp. 2d 459, 467 (Vt. 2000) (noting testimony of Senator Shumlin before the legislature that raising funds "was one of the most distasteful things that I've had to do in public ser-vice" (internal quotation marks omitted)); *Landell* v. *Sorrell*, 382 F. 3d 91, 123 (CA2 2004) (public officials testified at trial that "elected officials spend time with donors rather than on their official duties").

The legislature's findings are surely significant enough to justify the Court of Appeals's remand to the District

_____

*In approving the public funding provisions of the subject campaign finance law, Subtitle H of the Internal Revenue Code, the *Buckley* Court appreciated that in enacting the provision Congress was legislat-ing in part "to free candidates from the rigors of fundraising," 424 U. S., at 91; see also *id.,* at 96 ("Congress properly regarded public financing as an appropriate means of relieving major-party Presidential candi-dates from the rigors of soliciting private contributions"). Recognition of the interest as to Subtitle H, a question of congressional power involving a different evidentiary burden, see *South Dakota* v. *Dole,* 483 U. S. 203, 207 (1987); see also *Buckley*, *supra*, at 90, does not imply a conclusive rejection of it as to the separate issue of expenditure limits.

Court to decide whether Vermont's spending limits are the least restrictive means of accomplishing what the court unexceptionably found to be worthy objectives. See *id.,* at 124–125, 135–137. The District Court was instructed to examine a variety of outstanding issues, including alternatives considered by Vermont's Legislature and the reasons for rejecting them. See *id.,* at 136. Thus, the constitutionality of the expenditure limits was not conclusively decided by the Second Circuit, and I believe the evidentiary work that remained to be done would have raised the prospect for a sound answer to that question, whatever the answer might have been. Instead, we are left with an unresolved question of narrow tailoring and with consequent doubt about the justifiability of the spending limits as necessary and appropriate correctives. This is not the record on which to foreclose the ability of a State to remedy the impact of the money chase on the democratic process. I would not, therefore, disturb the Court of Appeals's stated intention to remand.

## II

Although I would defer judgment on the merits of the expenditure limitations, I believe the Court of Appeals correctly rejected the challenge to the contribution limits. Low though they are, one cannot say that "the contribution limitation[s are] so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 397 (2000).

The limits set by Vermont are not remarkable departures either from those previously upheld by this Court or from those lately adopted by other States. The plurality concedes that on a per-citizen measurement Vermont's limit for statewide elections "is slightly more generous," *ante*, at 18, than the one set by the Missouri statute ap-

proved by this Court in *Shrink, supra.* Not only do those dollar amounts get more generous the smaller the district, they are consistent with limits set by the legislatures of many other States, all of them with populations larger than Vermont's, some significantly so. See, *e.g., Montana Right to Life Assn.* v. *Eddleman,* 343 F. 3d 1085, 1088 (CA9 2003) (approving $400 limit for candidates filed jointly for Governor and Lieutenant Governor, since increased to $500, see Mont. Code Ann. §13–37–216(1)(a)(i) (2005)); *Daggett* v. *Commission on Governmental Ethics and Election Practices,* 205 F. 3d 445, 452 (CA1 2000) ($500 limit for gubernatorial candidates in Maine); *Minnesota Citizens Concerned for Life, Inc.* v. *Kelley,* 427 F. 3d 1106, 1113 (CA8 2005) ($500 limit on contributions to legislative candidates in election years, $100 in other years); *Florida Right to Life, Inc.* v. *Mortham,* No. 6:98–770–CV, 2000 WL 33733256, *3 (MD Fla., Mar. 20, 2000) ($500 limit on contributions to any state candidate). The point is not that this Court is bound by judicial sanctions of those numbers; it is that the consistency in legislative judgment tells us that Vermont is not an eccentric party of one, and that this is a case for the judicial deference that our own precedents say we owe here. See *Shrink, supra,* at 402 (BREYER, J., concurring) ("Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments"); see also *ante,* at 14 (plurality opinion) ("[O]rdinarily we have deferred to the legislature's determination of [matters related to the costs and nature of running for office]").

To place Vermont's contribution limits beyond the constitutional pale, therefore, is to forget not only the facts of *Shrink,* but also our self-admonition against second-guessing legislative judgments about the risk of corruption to which contribution limits have to be fitted. See *Shrink, supra,* at 391, and n. 5. And deference here would surely not be overly complaisant. Vermont's legislators them-

selves testified at length about the money that gets their special attention, see Act 64, H. 28, Legislative Findings and Intent, at App. 20 (finding that "[s]ome candidates and elected officials, particularly when time is limited, respond and give access to contributors who make large contributions in preference to those who make small or no contributions"); 382 F. 3d, at 122 (testimony of Elizabeth Ready: "If I have only got an hour at night when I get home to return calls, I am much more likely to return [a donor's] call than I would [a non-donor's] . . . . [W]hen you only have a few minutes to talk, there are certain people that get access" (alterations in original)). The record revealed the amount of money the public sees as suspiciously large, see 118 F. Supp. 2d, at 479–480 ("The limits set by the legislature . . . accurately reflect the level of contribution considered suspiciously large by the Vermont public. Testimony suggested that amounts greater than the contribution limits are considered large by the Vermont public"). And testimony identified the amounts high enough to pay for effective campaigning in a State where the cost of running tends to be on the low side, see *id.,* at 471 ("In the context of Vermont politics, $200, $300, and $400 donations are clearly large, as the legislature determined. Small donations are considered to be strong acts of political support in this state. William Meub testified that a contribution of $1 is meaningful because it represents a commitment by the contributor that is likely to become a vote for the candidate. Gubernatorial candidate Ruth Dwyer values the small contributions of $5 so much that she personally sends thank you notes to those donors"); *id.,* at 470–471 ("In Vermont, many politicians have run effective and winning campaigns with very little money, and some with no money at all. . . . Several candidates, campaign managers, and past and present government officials testified that they will be able to raise enough money to mount effective campaigns in the system of

contribution limits established by Act 64"); *id.,* at 472 ("Spending in Vermont statewide elections is very low . . . . Vermont ranks 49th out of the 50 states in campaign spending. The majority of major party candidates for statewide office in the last three election cycles spent less than what the spending limits of Act 64 would allow. . . . In Vermont legislative races, low-cost methods such as door-to-door campaigning are standard and even expected by the voters").

Still, our cases do not say deference should be absolute. We can all imagine dollar limits that would be laughable, and per capita comparisons that would be meaningless because aggregated donations simply could not sustain effective campaigns. The plurality thinks that point has been reached in Vermont, and in particular that the low contribution limits threaten the ability of challengers to run effective races against incumbents. Thus, the plurality's limit of deference is substantially a function of suspicion that political incumbents in the legislature set low contribution limits because their public recognition and easy access to free publicity will effectively augment their own spending power beyond anything a challenger can muster. The suspicion is, in other words, that incumbents cannot be trusted to set fair limits, because facially neutral limits do not in fact give challengers an even break. But this received suspicion is itself a proper subject of suspicion. The petitioners offered, and the plurality invokes, no evidence that the risk of a pro-incumbent advantage has been realized; in fact, the record evidence runs the other way, as the plurality concedes. See *ante*, at 22 ("the record does contain some anecdotal evidence supporting the respondents' position, namely, testimony about a post-Act-64 competitive mayoral campaign in Burlington, which suggests that a challenger can 'amas[s] the resources necessary for effective advocacy,' *Buckley,* 424 U. S., at 21"). I would not discount such evidence that

these low limits are fair to challengers, for the experience of the Burlington race is confirmed by recent empirical studies addressing this issue of incumbent's advantage. See, *e.g.,* Eom & Gross, Contribution Limits and Disparity in Contributions Between Gubernatorial Candidates, 59 Pol. Research Q. 99, 99 (2006) ("Analyses of both the number of contributors and the dollar amount of contributions [to gubernatorial candidates] suggest no support for an increased bias in favor of incumbents resulting from the presence of campaign contribution limits. If anything, contribution limits can work to reduce the bias that traditionally works in favor of incumbents. Also, contribution limits do not seem to increase disparities between gubernatorial candidates in general" (emphasis deleted)); Bardwell, Money and Challenger Emergence in Gubernatorial Primaries, 55 Pol. Research Q. 653 (2002) (finding that contribution limits favor neither incumbents nor challengers); Hogan, The Costs of Representation in State Legislatures: Explaining Variations in Campaign Spending, 81 Soc. Sci. Q. 941, 952 (2000) (finding that contribution limits reduce incumbent spending but have no effect on challenger or open-seat candidate spending). The Legislature of Vermont evidently tried to account for the realities of campaigning in Vermont, and I see no evidence of constitutional miscalculation sufficient to dispense with respect for its judgments.

## III

Four issues of detail call for some attention, the first being the requirement that a volunteer's expenses count against the person's contribution limit. The plurality certainly makes out the case that accounting for these expenses will be a colossal nuisance, but there is no case here that the nuisance will noticeably limit volunteering, or that volunteers whose expenses reach the limit cannot continue with their efforts subject to charging their candi-

dates for the excess. Granted, if the provisions for contribution limits were teetering on the edge of unconstitutionality, Act 64's treatment of volunteers' expenses might be the finger-flick that gives the fatal push, but it has no greater significance than that.

Second, the failure of the Vermont law to index its limits for inflation is even less important. This challenge is to the law as it is, not to a law that may have a different impact after future inflation if the state legislature fails to bring it up to economic date.

Third, subjecting political parties to the same contribution limits as individuals does not condemn the Vermont scheme. What we said in *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.,* 533 U. S. 431, 454–455 (2001), dealing with regulation of coordinated expenditures, goes here, too. The capacity and desire of parties to make large contributions to competitive candidates with uphill fights are shared by rich individuals, and the risk that large party contributions would be channels to evade individual limits cannot be eliminated. Nor are these reasons to support the party limits undercut by claims that the restrictions render parties impotent, for the parties are not precluded from uncoordinated spending to benefit their candidates. That said, I acknowledge the suggestions in the petitioners' briefs that such restrictions in synergy with other influences weakening party power would justify a wholesale reexamination of the situation of party organization today. But whether such a comprehensive reexamination belongs in courts or only in legislatures is not an issue presented by these cases.

Finally, there is the issue of Act 64's presumption of coordinated expenditures on the part of political parties, Vt. Stat. Ann., Tit. 17, §2809(d) (2002). The plurality has no occasion to reach it; I do reach it, but find it insignificant. The Republican Party petitioners complain that the

related expenditure provision imposes on both the candidate and the party the burden in some circumstances to prove that coordination of expenditure did not take place, thus threatening to charge against a candidate's spending limits some party expenditures that are in fact independent, with an ultimate consequence of chilling speech. See Brief for Respondent/Cross-Petitioner Vermont Republican State Committee et al. 45–46. On the contrary, however, we can safely take the presumption on the representation to this Court by the Attorney General of Vermont: the law imposes not a burden of persuasion but merely one of production, leaving the presumption easily rebuttable. See Tr. of Oral Arg. 39–41 (representation that the presumption disappears once credible evidence, such as an affidavit, is offered); see also Brief for Respondent/Cross-Petitioner William H. Sorrell et al. 48 (the presumption "contributes no evidence and disappears when facts appear. In a case covered by the presumption, a political party need only present some evidence that the presumed fact is not true and the presumption vanishes. . . . Simple testimony that the expenditure was not coordinated would suffice to defeat the presumption" (citations, internal quotation marks, and alterations omitted)). As so understood, the rebuttable presumption clearly imposes no onerous burden like the conclusive presumption in *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 619 (1996) (principal opinion), or the nearly conclusive one in *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 785–786 (1988). Requiring the party in possession of the pertinent facts to come forward with them, as easily as by executing an affidavit, does not rise to the level of a constitutionally offensive encumbrance here. Cf. *County Court of Ulster Cty.* v. *Allen,* 442 U. S. 140, 158, n. 16 (1979) ("To the extent that a presumption imposes an extremely low burden of production— *e.g.,* being satisfied by 'any' evidence—it may well be that its

impact is no greater than that of a permissive inference").

## IV

Because I would not pass upon the constitutionality of Vermont's expenditure limits prior to further enquiry into their fit with the problem of fundraising demands on candidates, and because I do not see the contribution limits as depressed to the level of political inaudibility, I respectfully dissent.